**Affirmed as Modified and Concurring and Dissenting Opinion filed October 18, 2018.**



In The

# Fourteenth Court of Appeals

---

## NO. 14-17-00207-CV

---

### LANDRY'S, INC. AND HOUSTON AQUARIUM, INC., Appellants

### V.

### ANIMAL LEGAL DEFENSE FUND, CARNEY ANNE NASSER, AND CHERYL CONLEY, Appellees

---

**On Appeal from the 334th District Court
Harris County, Texas
Trial Court Cause No. 2016-79698**

---

### O P I N I O N

This is an appeal from a case's dismissal under the Texas Citizens Participation Act ("the TCPA"). *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 27.001–.011 (West 2015). Appellants Landry's, Inc. and Houston Aquarium, Inc. sued Cheryl Conley, Conley's reputed attorney Carney Ann Nasser, and Nasser's employer Animal Legal Defense Fund ("ALDF"), asserting a variety of claims in connection with the publication of Conley's

notice of intent to sue under the Endangered Species Act for the appellants' allegedly inadequate care and housing of four white tigers, as well as the publication of other statements related to the planned suit. They also asserted claims for defamation, business disparagement, tortious interference with prospective business relations, abuse of process, trespass, conspiracy to commit each of these torts, and conspiracy to commit theft. In connection with their defamation and business-disparagement claims, Landry's and Houston Aquarium additionally sought declaratory and injunctive relief.

We conclude that the judicial-proceedings privilege applies to the allegedly defamatory or disparaging statements as a matter of law, and that Landry's and Houston Aquarium failed to meet their initial burden under the TCPA to establish by clear and specific evidence a prima facie case for each essential element of their claims of abuse of process, trespass, and conspiracy to commit theft.

Landry's and Houston Aquarium also contend that the TCPA violates the Texas Constitution's guarantee of the right to a jury trial and its open-courts provision. Most of their arguments are predicated on the existence of a material fact question or on the dismissal of only some of their claims. Because those circumstances are not present here, we do not reach those arguments. In their only remaining constitutional argument, we conclude that the TCPA's sanctions provision is not facially unconstitutional for allegedly vesting a trial court with too much discretion.

Finally, Landry's and Houston Aquarium challenge the denial of their conditional motion for discovery and the trial court's awards of attorneys' fees and sanctions. We find no abuse of discretion in the denial of the discovery motion, and the parties agree that the appellate attorneys' fees conditionally awarded for the work of a particular law firm on behalf of ALDF and Nasser are not recoverable because the firm withdrew from the case. As for the sanctions, we hold that the trial court's award of $450,000 in sanctions is excessive. We suggest remittitur to reduce the amount of sanctions to an amount equal

2

to that of the trial attorneys' fees awarded. Specifically, we suggest remittitur of $146,814.74 from the $250,000.00 awarded to ALDF and $128,705.00 from the $200,000.00 awarded to Conley, bringing those awards respectively to $103,191.26 and $71,295.00.

Regarding Nasser, to whom no sanctions were awarded, we affirm the judgment as modified to eliminate the conditional award of appellate attorneys' fees to the law firm that withdrew from the case. As to ALDF, and conditioned upon ALDF's acceptance of our suggestion of remittitur, we affirm the judgment as modified to eliminate the same conditional award of appellate attorneys' fees and to reduce ALDF's sanctions award to $103,191.26. Regarding Conley, and conditioned upon her acceptance of our suggestion of remittitur, we affirm the judgment as modified to reduce her sanctions award to $71,295.00.

## I. BACKGROUND

This case centers on the disputed quality of the care provided to four white tigers exhibited at an aquarium and restaurant in downtown Houston. Houston Aquarium, Inc. owns and operates the physical facility known as the Downtown Aquarium, which is described as "a high-profile six (6) acre entertainment complex" that includes a restaurant built around a 500,000-gallon aquarium. Four white tigers also are housed at the Downtown Aquarium, and up to two of them can be viewed at a time in the exhibit known as "Maharaja's Temple." The exhibit is designed to look like an ancient temple, and features steps, a statue, a swimming pool, an artificial tree, and a waterfall. Houston Aquarium is indirectly owned by Landry's, which identifies itself in its pleadings as "one of America's leading dining, entertainment, gaming, and hospitality groups," owning more than 500 properties, including restaurants, hotels, and other entertainment destinations. Landry's and Houston Aquarium generally do not distinguish between the

two companies, instead referring to them both as "Landry's." We follow the same convention.[1]

In March 2015, radio-station owner Cheryl Conley considered producing a segment about wildlife and contacted Landry's to ask for a behind-the-scenes tour of the tiger's housing. Although Landry's charges the public an additional fee to access this part of the facility, it allowed Conley, as a member of the media, to see and photograph the tigers' holding pens for free.

On September 19, 2016, attorney Carney Anne Nasser of the Animal Legal Defense Fund ("ALDF") and attorneys from the law firm of Irvine & Conner PLLC sent Landry's notice of an intended suit against it under the Endangered Species Act. *See* 16 U.S.C. § 1540(g). The Endangered Species Act requires a person suing under the Act to first provide sixty days' written notice to the alleged violator and to the Secretary of the Interior. *Id.* § 1540(g)(2)(A)(i). The Notice Letter was written "[o]n behalf of [ALDF] and Cheryl Conley, represented by Irvine & Conner PLLC" and informed Landry's "of our intent to sue" under the Endangered Species Act's citizen-suit provision. In the Notice Letter, it is alleged that the conditions of the tigers' exhibit and holding areas violate the Endangered Species Act and portions of the draft Tiger Care Manual produced by the Association of Zoos and Aquariums ("AZA") for AZA-accredited organizations. Copies of the Notice Letter were sent to the Department of the Interior as required by federal law.[2] Copies also were sent to the national and regional directors of the Department of

---

[1] The inspection reports of the U.S. Department of Agriculture's Animal and Plant Health Inspection Service identify the facility as Landry's Downtown Aquarium, Inc. The parties do not explain whether this is a misnomer or a different entity, and the parties frequently use the term "Landry's" to include the facility. We therefore do the same. *Cf. Adams v. Starside Custom Builders, LLC*, 547 S.W.3d 890, 895 (Tex. 2018) (stating that when even the respondent to a TCPA motion to dismiss "admits that there is no practical difference" between it and a nonparty company, the TCPA movant "should not lose his motion to dismiss merely for conflating the two entities in his briefing").

[2] *See* 16 U.S.C. § 1540(g)(2)(A)(i).

4

the Interior's Fish and Wildlife Service, which administers the Endangered Species Act;[3] to the registered agent for Landry's; to counsel for Landry's; and to Houston's mayor Sylvester Turner. On the same day, ALDF published a press release on its website about service of the Notice Letter. ALDF also sent a press release to Denver news station ABC-Denver7, where Landry's or an affiliated company owns another aquarium at which tigers are exhibited. The Denver news station wrote an article about the threatened suit, "Downtown Aquarium owners, Landry's, facing possible lawsuit over tigers at Houston location." ALDF also provided a copy of the Notice Letter to the *Houston Chronicle*, which discussed the Notice Letter in its article, "Animal rights group threatens to sue Landry's over tigers at Downtown Aquarium." A few days later, the internet website *The Dodo* published a similar article titled, "White Tigers Stuck In Aquarium Haven't Felt The Sun In 12 Years."

In the ten days following the Notice Letter, ALDF made five Facebook posts about the tigers, and Nasser and ALDF executive director Stephen Wells each "tweeted" about the tigers once. The law firm Irvine & Conner wrote about the Notice Letter on the firm's "news and blog" page and maintained a link to ALDF's Press Release. The law firm also maintained a list of seven media outlets and links to articles related to the lawsuit.

Fifty-nine days after ALDF sent Landry's the sixty-day Notice Letter, Landry's sued ALDF, Nasser, and Conley (collectively, "the Conley Parties") for defamation, business disparagement, tortious interference with prospective business relations, and abuse of process. Landry's also sued Conley for trespass. Finally, Landry's alleged that the Conley Parties conspired to commit each of the above torts, and additionally conspired to commit theft. Landry's sought actual damages of between $100,000.00–$200,000.00, exemplary damages, declaratory relief, an order that the Conley Parties retract the

---

[3] *See id.* § 1537a.

allegedly defamatory statements, and an injunction barring the Conley Parties from defaming or disparaging Landry's in the future.

The Conley Parties moved to dismiss the claims against them under the TCPA. They argued that Landry's asserted claims related to their exercise of the rights of free speech, petition, and association, and that Landry's was unable to make out a prima facie case for its claims. The Conley Parties also asserted that, in any event, the claims were barred by the judicial-proceedings privilege. ALDF and Nasser additionally argued that attorney immunity applied to the claims against them. Landry's maintained that it could make out a prima facie case for its claims, but asked that if the trial court disagreed, then the trial court should allow Landry's to conduct discovery.

The trial court granted the Conley Parties' motions to dismiss and denied the discovery motion. As sanctions for bringing the lawsuit and to deter similar actions in the future, the trial court ordered Landry's to pay $250,000 to ALDF and $200,000 to Conley. The trial court awarded ALDF $82,405.00 for the trial attorneys' fees of Ahmad, Zavitsanos, Anaipakos, Alavi, & Mensing, P.C. and awarded $20,786.26 jointly to ALDF and Nasser for the trial attorneys' fees of Sprott Newsom Quattlebaum & Messenger, P.C. ("Sprott Newsom"). Conley was awarded trial attorneys' fees of $71,295.00 for the work of law firm Mahendru, P.C. As to each of the three law firms, the Conley Parties also were conditionally awarded $50,000.00 for the firm's fees in the event Landry's were to file an unsuccessful intermediate appeal; $25,000.00 if Landry's were to unsuccessfully petition for review by the Texas Supreme Court; and $25,000.00 if Landry's were ultimately to be unsuccessful in an appeal to the Texas Supreme Court. Landry's superseded the judgment and moved unsuccessfully for reconsideration, modification of the judgment, or a new trial before bringing this appeal.

## II. Issues Presented

Landry's argues that the judgment must be reversed, in whole or in part, because

1. Landry's satisfied its burden to establish by clear and specific evidence each element of its claims;

2. the Conley Parties failed to satisfy their burden to establish, by a preponderance of the evidence, valid defenses against Landry's claims;

3. the TCPA is unconstitutional;

4. the trial court abused its discretion in denying Landry's motion for discovery;

5. the awards of attorneys' fees must be vacated if any claim was improperly dismissed, and in any event, the appellate attorneys' fees conditionally awarded to Sprott Newsom must be vacated because the firm withdrew from its representation;[4] and

6. the sanctions are excessive, arbitrary, and unsupported by evidence.

We begin our analysis with the allegedly defamatory statements on which this suit is based.

## III. The Allegedly Defamatory Statements

To maintain a defamation claim, the plaintiff must prove that (1) the defendant published a false statement of fact; (2) the statement defamed the plaintiff; (3) the defendant acted with actual malice, if the plaintiff is a public figure or a public official, or negligently, if the plaintiff is a private individual; (4) the statement proximately caused damages. *See Anderson v. Durant*, 550 S.W.3d 605, 617–18 (Tex. 2018); *WFAA-TV, Inc. v. McLemore*, 978 S.W.2d 568, 571 (Tex. 1998).

---

[4] We have reordered the issues to first address those issues on which, if sustained, Landry's would be entitled to rendition of judgment in whole or in part.

Unless the publication is ambiguous, the question of whether a publication is reasonably capable of a defamatory meaning is a question of law. *See Dall. Morning News, Inc. v. Tatum*, 554 S.W.3d 614, 625 (Tex. 2018); *Turner v. KTRK Television, Inc.*, 38 S.W.3d 103, 114 (Tex. 2000). This determination is not based on individual statements read in isolation; rather, a publication is defamatory if, construed as a whole in light of the surrounding circumstances, a person of ordinary intelligence would perceive it to be so. *Turner*, 38 S.W.3d at 114–15. Whether a publication is defamatory is determined "not so much by its effect when subjected to the critical analysis of a mind trained in the law, but by the natural probable effect on the mind of the average reader." *Kapellas v. Kofman*, 459 P.2d 912 (Cal. 1969) (en banc) (quoted in parenthetical in *Turner*, 38 S.W.3d at 114). This is an objective inquiry. *Tatum*, 554 S.W.3d at 624.

Regarding the element of fault, general-purpose public figures are those whose pervasive fame or notoriety makes them public figures for all purposes and contexts. We agree with the Conley Parties that Landry's is a public figure, for as Landry's stated in its pleadings, "Landry's is one of America's leading dining, entertainment, gaming and hospitality groups," and it "owns and operates more than 500 properties, including more than 40 unique brands" as well as "numerous hotel properties and other entertainment destinations." As a general-purpose public figure, Landry's was required to produce evidence establishing a prima facie case of actual malice to support its defamation claims.

In this context, "actual malice" means that the statement was made with knowledge of its falsity or with reckless disregard for its truth. *In re Lipsky*, 460 S.W.3d 579, 593–94 (Tex. 2015) (orig. proceeding) (citing *Huckabee v. Time Warner Entm't Co.*, 19 S.W.3d 413, 420 (Tex. 2000)). Reckless disregard is a subjective standard focusing on the defendant's conduct and state of mind. *Bentley v. Bunton*, 94 S.W.3d 561, 591 (Tex. 2002). Proof of reckless disregard requires evidence that the defendant had serious doubts

8

about the truth of the publication, or stated differently, that the defendant had a high degree of awareness of the probable falsity of the statement. *Id.*

As for the element of damages, if the statement is defamatory per se—that is, if it injures the plaintiff in its office, profession, or occupation—then nominal general damages are presumed. *Anderson*, 550 S.W.3d at 618 (addressing nominal damages); *Hancock v. Variyam*, 400 S.W.3d 59, 55 (Tex. 2013) (defining defamation per se). Special damages for specific economic losses are never presumed. *Anderson*, 550 S.W.3d at 618.

To resist a TCPA motion to dismiss a defamation claim, the plaintiff's pleadings and evidence must establish "the facts of when, where, and what was said, the defamatory nature of the statements, and how they damaged the plaintiff." *Lipsky*, 460 S.W.3d at 591. In its pleading, Landry's alleged that it was defamed in the statements described below.

## A.    The Notice Letter

Landry's alleged that the Notice Letter is false and defamatory as a whole, and that it contains the following false and defamatory statements:

> For twelve years, Landry's has deprived these tigers access to sunlight, fresh air, natural surfaces, and species-appropriate environmental enrichment.
>
> . . . .
>
> [T]he tigers cannot jump or run and live entirely on unnatural and unyielding surfaces.
>
> . . . .
>
> The Tiger Exhibit lacks any naturalistic features or enrichment and does not offer the tigers any opportunities to mimic their natural behaviors, such as stalk or hunt, or hide from public view. For example, there are no tree trunks on which the tigers can sharpen their claws and no species-appropriate toys that would allow them to stalk, chase or pounce.
>
> . . . .

9

Living on unnatural, unyielding concrete also increases the cats' risk of painful foot, joint, muscle, and circulatory problems and ulcerated or cracked footpads. . . .

Indeed, the tigers have been observed pacing and lunging at the glass wall separating the tigers from the public—all common stress responses for tigers living in close confinement with no ability to seek privacy from the viewing public.

. . . .

Whether in the public Tiger Exhibit or Tiger Holding Area, [the tigers] do not receive adequate species-appropriate enrichment.

. . . .

As a result of these unnatural conditions, the four tigers experience pervasive stress and exhibit stereotypic behaviors not observed in the wild, such as incessant pacing. They also have exhibited overly aggressive behavior, a sign of stress associated with confinement.

## B.    ALDF's Press Release

On the same date it sent the Notice Letter to Landry's, ALDF provided a Press Release to certain news outlets and published the Press Release on its website. Landry's alleged the Press Release is defamatory as a whole and that the following specific statements within it are defamatory:

The [Notice Letter] alleges harm and harassment to a federally listed species: four tigers . . . who are kept in deplorable conditions at the Aquarium. . . .

For the last 12 years, Landry's has deprived these four tigers . . . of any access to sunlight, fresh air, or natural surfaces. These species-inappropriate living conditions violate the ESA . . . . At no point do the tigers have the opportunity to run, jump, or engage in the full range of their natural behaviors.

"The dungeon-like conditions that the tigers are forced to endure at Houston's Downtown Aquarium harm their physical health and psychological wellbeing and deny them much that is natural and important to a tiger," says renowned big cat veterinarian Dr. Jennifer Conrad. "It is cruel to confine complex, roaming carnivores such as tigers to a tiny, dark, artificial, unenriched enclosure where they never see any daylight, much less

10

bask in sunshine, and are at risk for serious long term, debilitating injuries from being forced to live on slippery, unyielding concrete their entire lives."

. . . .

"Tigers are complex apex predators with specific biological environmental, and enrichment needs," says Animal Legal Defense Fund Executive Director Stephen Wells. "Landry's, Inc. should stick to the restaurant business and leave the housing of tigers to those who are able to provide big cats with proper care and naturalistic habitats rather than sacrificing the wellbeing of an endangered species for the sake of tourist dollars."

By forcing these tigers to live in what amounts to a concrete dungeon, Landry's has profited financially, but caused the tigers serious mental and physical harm. . . . Retiring the tigers to a sanctuary will guarantee that the tigers may spend the rest of their lives in the species-appropriate conditions that they need and deserve.[5]

## C.     Statements to the Media

Landry's also alleged in its petition that the Conley Parties' statements to three news outlets were defamatory. The ALDF provided copies of the Notice Letter and its Press Release to the *Houston Chronicle* and ABC-Denver7; the online magazine *The Dodo* also covered the release of these documents and provided links to them.[6] All three

---

[5] Several statements in the Press Release are matters of opinion rather than statements of fact. For example, the characterizations of the tigers' living conditions as "deplorable" or "dungeon-like" are statements of opinion. Whether a naturalistic habitat is a part of the "proper care" of tigers also appears to be a matter of opinion. The AZA's Tiger Care Manual, for example, says that "[a]ll tiger exhibits should include . . . [r]elatively large, complex outdoor space" and "natural vegetation"; that "natural outdoor dirt substrates are recommended" for the flooring in tiger exhibits; and that concrete flooring is not recommended "due to its porosity, abrasiveness, and hardness," unless a coating is applied to seal, smooth, and soften the floor. Association of Zoos & Aquariums, *Tiger (Panthera tigris) Care Manual*, at 11, 12, *available at* https://www.aza.org/animal-care-manuals, then click "Tiger" (last visited Oct. 16, 2018). The manual further states that abrasive flooring can cause footpad trauma or exaggerated pacing, and "[i]f the surface is too hard (e.g., concrete), trauma to bony prominences in normal resting or sleeping positions can result." *Id.* at 12. The AZA nevertheless accredited the Downtown Aquarium even though the tigers have no access to the outdoors; the tree in the tiger exhibit is artificial; and the permanent substrate in the both the tiger exhibit and the holding areas is texturized concrete. At least according to the AZA manual, a naturalistic habitat is optional.

[6] *See* Kim McGuire, *Animal rights group threatens to sue Landry's over tigers at Downtown Aquarium*, HOUSTON CHRONICLE, Sept. 19, 2016, *available at* https://www.houstonchronicle.com/news/houston-texas/houston/article/Animal-rights-group-threatens-

11

sources paraphrased or quoted parts of the Press Release or the Notice Letter, such as the assertions that the tigers have no access to sunlight or fresh air.

Each of the three articles additionally quoted a different opinion by Nasser.  The *Houston Chronicle* quoted Nasser, identified as "an attorney for the Animal Legal Defense Fund," as saying, "It is really quite shocking that the AZA has two exhibits like this where clearly its only purpose is for the amusement of the visiting public."  To ABC-Denver7, Nasser opined, "Should Landry's refuse to do the right thing and take ALDF up on its offer to retire the cats to a reputable sanctuary, the outcome of the ESA litigation against Landry's in Texas will be precedent that may impact Landry's in Colorado."  She also stated to *The Dodo*, "In this post-Blackfish era, an enlightening public is turning away from the notion that displaying animals for purely entertainment reasons, and without any regard to their complex species-specific needs, is ever appropriate."

**D.     Posts on Irvine & Conner's website**

Irvine & Conner posted information on its website regarding service of the Notice Letter and included a list of media outlets and links to articles about the lawsuit, as well as a link to ALDF's Press Release.

**E.     ALDF's Facebook Posts**

ALDF posted the following statement on its Facebook page on the night that it sent the Notice Letter:

> The Animal Legal Defense Fund sent a notice of intent to sue Landrys, Inc. and the Houston Aquarium for violating the Endangered Species Act by

---

to-sue-Landry-s-9233183.php (last visited Oct. 16, 2018); Deb Stanley, *Downtown Aquarium owners, Landry's, facing possible lawsuit over tigers at Houston location*, THEDENVERCHANNEL.COM, Sept. 19, 2016, *available at* https://www.thedenverchannel.com/news/front-range/denver/downtown-aquarium-owners-landrys-facing-possible-lawsuit-over-tigers-at-houston-location (last updated Sept. 20, 2016); Zainab Akande, *White Tigers Stuck In Aquarium Haven't Felt The Sun In 12 Years*, THE DODO, Sept. 23, 2016, *available at* https://www.thedodo.com/white-tigers-downtown-aquarium-houston-2014116306.html (last visited Oct. 16, 2018).

confining four tigers to a substandard concrete enclosure. We have secured placement for these cats at reputable sanctuaries where they will feel sunshine on their backs and something other than concrete under their paws.

This post accurately reports that ALDF sent the Notice Letter and paraphrases its contents. The same is true of ALDF's similar post the next day: "The Animal Legal Defense Fund sent a notice of intent to sue Landrys, Inc. and the Houston Aquarium for violating the Endangered Species Act by confining four tigers to a substandard concrete enclosure."

ALDF next posted, without attribution, Wells's opinion from ALDF's Press Release:

> Tigers are complex apex predators with specific biological, environmental and enrichment needs. Landry's, Inc. should stick to the restaurant business and leave the housing of tigers to those who are able to provide big cats with proper care and naturalistic habitats rather than sacrificing the wellbeing of an endangered species for the sake of tourist dollars.

A week later, ALDF posted the following:

> The tigers held captive at Houston's Downtown Aquarium are denied so much that is natural and important to a member of their species. The Animal Legal Defense Fund is offering to rehome the four white tigers in lieu of litigation.[7]

Shortly thereafter, ALDF similarly posted, "The conditions these tigers endure at Houston's Downtown Aquarium deny them much that is natural and important to a tiger."

---

[7] The second sentence is true. The first sentence can be characterized either as true or as a statement of opinion; the distinction is one on which reasonable people may disagree. *Compare Tatum*, 554 S.W.3d at 640 (Brown, J., joined by Hecht, C.J., and Johnson, J.) (three justices would hold that a statement in a newspaper column implying that the appellees placed a deceptive obituary was "both literally and substantially true") *with id.* at 645 (Boyd, J., concurring, joined by Lehrmann and Blacklock, J.J.) (three justices would hold that the column implied only the author's opinion that the obituary was deceptive). The post was accompanied by a photo of one of the tigers and by a link to KHOU.com, neither of which was alleged to be defamatory.

## F.  "Tweets"

On the same date ALDF sent Landry's the Notice Letter, Nasser accurately "tweeted," "Today @ALDF sent a notice of intent to sue @LandrysInc and @Aquarium Houston 4 #EndangeredSpeciesAct violations."

The next day, ALDF's executive director Stephen E. Wells tweeted, "4 neglected while tigers are living in horrible conditions at an aquarium.  @ALDF intends to sue." The tweet is accompanied by a link to the previously discussed *Houston Chronicle* article.

## IV.  THE JUDICIAL-PROCEEDINGS PRIVILEGE

Many of the statements at issue are non-actionable because they were not shown to be false statements of fact but instead were either true or were merely opinions.  We nevertheless assume, without deciding, that as to at least some of the remaining statements, Landry's met its burden to establish by clear and convincing evidence each essential element of its defamation claim.  *See* TEX. CIV. PRAC. & REM. CODE ANN. § 27.005(c).[8]  Given that assumption, the Conley Parties were entitled to dismissal of the defamation claims and related causes of action only if they proved a valid defense to those claims by a preponderance of the evidence.  *See id.* § 27.005(d).  To do so, they relied on the judicial-proceedings privilege.

Under the judicial-proceedings privilege, "[c]ommunications in the due course of a judicial proceeding will not serve as the basis of a civil action for libel or slander, regardless of the negligence or malice with which they are made." *James v. Brown*, 637 S.W.2d 914, 916–17 (Tex. 1982) (per curiam) (citing *Reagan v. Guardian Life Ins. Co.*, 140 Tex. 105, 166 S.W.2d 909 (1942)).  Although Landry's asserts on appeal that the

---

[8] In particular, we do not determine whether is true or false that Landry's has violated the Endangered Species Act.  That is a question to be answered in the federal court where the matter is now pending.  *See* Orig. Complaint, *Cheryl Conley v. Hous. Aquarium, Inc. and Landry's, Inc.*, C.A. 4:17-CV-2877, 2017 WL 4284657 (S.D. Tex. Sept. 26, 2017).

privilege applies only to counsel, the judicial-proceedings privilege applies to counsel, parties, and witnesses, among others. *See id.*; *see also* RESTATEMENT (SECOND) OF TORTS § 586 (1977) (counsel); *id.* § 587 (parties); *id.* § 588 (witnesses).[9]  In the trial court, the Conley Parties asserted the judicial-proceedings privilege only as it applies to counsel, but on appeal, ALDF additionally asserts the privilege as it applies to parties.[10]

When the communication at issue is made by an attorney, the judicial-proceedings privilege is referred to as attorney immunity. *Cf. Youngkin v. Hines*, 546 S.W.3d 675, 679 n.2 (Tex. 2018) (explaining, in a case in which an attorney claimed non-liability for acts taken in the course of representing a claim, that "litigation privilege" and "attorney

---

[9] Landry's states that courts have held that the privilege does not extend to extrajudicial statements by non-attorneys.  In support, Landry's relies on *HMC Hotel Properties v. Keystone-Texas Property Holding Corp.*, No. 04-10-00620-CV, 2011 WL 5869608, at *15 (Tex. App.—San Antonio Nov. 23, 2011) (mem. op.), *rev'd on other grounds*, 439 S.W.3d 910 (Tex. 2014).  In that case, the Fourth Court of Appeals reasoned that the privilege did not apply to out-of-court statements by non-attorneys "[b]ecause the extension of the privilege to out-of-court communications is based on the adoption of section 586 of the Restatement (Second) of Torts (which only pertains to communications by attorneys)." *Id.*  The authoring court further explained that section 586 was adopted based on "a public policy rationale in favor of attorneys as officers of the court." *Id.*

It is true that section 586 applies only to attorneys, but that is because the Restatement has separate sections applying the privilege to counsel, to parties, and to witnesses.  Concerning parties, the Restatement states that a party "*is absolutely privileged to publish defamatory matter concerning another in communications preliminary to a proposed judicial proceeding*, or in the institution of or during the course and as a part of, a judicial proceeding in which he participates, *if the matter has some relation to the proceeding*." *Id.* § 587 (emphasis added).  Section 586, which applies to attorneys, differs from section 587 only in the role played by the person claiming the privilege.  Thus, section 586 changes the phrase "a judicial proceeding in which he participates" to "a judicial proceeding in which he participates *as counsel*." *Id.* § 586.

Four years after *HMC Hotel Properties* was decided, the Texas Supreme Court cited section 587 of the Restatement and applied it to allegedly defamatory statements in a report given by Shell Oil to the Department of Justice when Shell seriously contemplated that it was about to become a defendant in a criminal case. *Shell Oil Co. v. Writt*, 464 S.W.3d 650, 654–55 (Tex. 2015).  In light of *Writt*, we find *HMC Hotel Properties'* reasoning unpersuasive.

[10] "We do not consider *issues* that were not raised in the courts below, but parties are free to construct new *arguments* in support of issues properly before the Court." *Greene v. Farmers Ins. Exch.*, 446 S.W.3d 761, 764 n.4 (Tex. 2014) (citing *Nall v. Plunkett*, 404 S.W.3d 552, 555–56 (Tex. 2013) (per curiam)); *accord*, *Adams*, 574 S.W.3d at 896–97 (applying *Greene* to a TCPA appeal).

immunity" describe the same doctrine).  As a result of attorney immunity, a claim for defamation cannot be based on an attorney's statement that is related to a proceeding for which the attorney is employed and that is within the scope of that representation.  *See Cantey Hanger, LLP v. Byrd*, 467 S.W.3d 477, 485 (Tex. 2015).  If the conduct at issue is of the kind that is within the scope of the attorney's representation of the client, then the privilege applies, regardless of the alleged wrongfulness of the conduct.  *Youngkin*, 546 S.W.3d at 681 (applying privilege despite allegations that attorney's conduct was fraudulent); *Cantey Hanger*, 47 S.W.3d at 485 (same).

The judicial-proceedings privilege is not limited to statements made in pending cases, but applies "to any statement that bears some relation to an existing or proposed judicial proceeding." *Fitzmaurice v. Jones*, 417 S.W.3d 627, 633 (Tex. App.—Houston [14th Dist.] 2013, no pet.) (quoting *Daystar Residential, Inc. v. Collmer*, 176 S.W.3d 24, 28 (Tex. App.—Houston [1st Dist.] 2004, pet. denied)), *disapproved on other grounds by Lipsky*, 460 S.W.3d at 587, 591.  If the statement was made before judicial proceedings were instituted, the statement is privileged only if it meets both an objective and a subjective component.  Objectively, the statement must be related to the proposed litigation; subjectively, the proceeding must have been actually contemplated in good faith and under serious consideration when the statement was made.  *Cf. Shell Oil Co. v. Writt*, 464 S.W.3d 650, 654–55 (Tex. 2015) (addressing statement by intended witness in planned proceeding); *James*, 637 S.W.2d at 917 (applying privilege to doctor's letter to children's attorney in contemplated guardianship proceeding that mother was not of sound mind).  Whether the statement is objectively related to the proposed litigation is a question of law. *Daystar Residential*, 176 S.W.3d at 28.  To answer that question, courts consider the entire communication in its context.  *Id.*

The Conley Parties contended in the trial court that ALDF, through Nasser, is Conley's counsel in the planned suit against Landry's under the Endangered Species Act.

Conley declared that each of the allegedly defamatory statements that Landry's attributes to ALDF or to Nasser were made in connection their representation of her in the contemplated suit. Nasser additionally declared that she and ALDF were participating in the suit against Landry's solely as Conley's co-counsel with Irvine & Conner and that it was not intended that ALDF would be a party to the suit.

Landry's, on the other hand, argues that until it sued the Conley Parties, ALDF consistently held itself out as a party to the planned suit. This characterization is accurate, as is illustrated by some of the ALDF statements we have quoted. But because the judicial-proceedings privilege applies to parties as well as counsel, it makes no difference whether, at the time the statements were made, ALDF planned to participate in the suit as Conley's counsel or as her co-plaintiff.

Objectively, the Notice Letter related to a contemplated judicial proceeding because it described the allegations that Conley and ALDF, whether on its own behalf or as counsel for Conley, intended to make in a suit against Landry's for violating the Endangered Species Act. The Conley Parties offered to forego the suit if Landry's would allow the ALDF to rehome the tigers. The Notice Letter is signed by an attorney with Irvine & Conner and by Nasser, an attorney with the ALDF. The notice letter was in furtherance of Irvine & Conner's representation of Conley and in furtherance of Nasser's representation of Conley or of ALDF, because the Notice Letter fulfills a statutory condition precedent to a citizen suit under the Endangered Species Act. *See* 16 U.S.C. § 1540(g)(2)(A)(i). Because an attorney's conduct in drafting a mandatory notice letter on behalf of a client is absolutely privileged, the contents of a notice letter cannot serve as the basis of a defamation claim. *Cf. Krishnan v. Law Office of Preston Henrichson, PC*, 83 S.W.3d 295, 302 (Tex. App.—Corpus Christi 2002, pet. denied) (privilege applies to notice letter required in a health care liability claim).

As for the subjective component, the evidence establishes that suit was seriously contemplated at the time the statements were made. Conley declared without contradiction that she retained counsel before September 1, 2016, to represent her in the suit against Landry's under the Endangered Species Act. Landry's itself produced evidence that its counsel and representatives attended a meeting with Nasser and Conley on August 2, 2016, at the office of Houston City Council Member Greg Travis, where the parties discussed both the future lawsuit and the offer to rehome the tigers in lieu of litigation. When Landry's refused ALDF's offer to rehome the tigers, Nasser tried to hand-deliver a notice of intent to sue, but Travis prevented her from doing so and told her to mail the documents. Nasser sent the Notice Letter to Landry's six weeks later. In addition to fulfilling a statutory prerequisite to suit, the Notice Letter elaborates on the Conley Parties' allegations by providing citations to federal statutes and regulations, case law, scholarly articles on tiger captivity and behavior, news articles, photographs of one of the tigers in the exhibit and in the holding pen, and a link to an uploaded video showing one of the tigers panting, lunging at a patron from behind the exhibit's glass wall, and walking back and forth along the glass wall. The evidence establishes that when the challenged statements were made in the latter half of September 2016, a lawsuit under the Endangered Species Act was not a mere possibility, and that the Conley Parties instead were taking affirmative steps toward litigation.

Landry's argues that the Conley Parties had not been seriously contemplating suing Landry's because they did not do so prior to this appeal. But as previously mentioned, Landry's struck first, suing the Conley Parties fifty-nine days after Nasser sent them the mandatory sixty-day Notice Letter. The litigation of this case was intense from the beginning: ALDF and Nasser moved for dismissal under the TCPA on the same day that they answered the suit, and Conley filed a similar motion three days later. Although the case was dismissed just forty-eight days after the Conley Parties answered the suit, the

18

record swelled to over three thousand pages in that time, and the Conley Parties incurred nearly $175,000 in legal fees.  That the Conley Parties refrained from suing Landry's in federal court while simultaneously defending themselves against Landry's in state court does not give rise to an inference that they had not been seriously contemplating a federal suit before Landry's sued them.

Turning to the Press Release, there is a split of authority about whether the judicial-proceedings privilege applies to press releases or statements to the press.  *Compare Daystar*, 176 S.W.3d at 27–29 (comments on result of autopsy report privileged where made to newspaper by attorney retained to file suit against same company based on a different but similar death) *and Dall. Indep. Sch. Dist. v. Finlan*, 27 S.W.3d 220, 239–40 (Tex. App.—Dallas 2000, pet. denied) (privilege applied to law firm's delivery of pleadings to the press and issuance of press release describing allegations and characterizing adversaries' motives) *with Bennett v. Computer Assocs. Int'l, Inc.*, 932 S.W.2d 197, 201 & n.4 (Tex. App.—Amarillo 1996, writ denied) (stating that the privilege applies to pleadings delivered to the press but not to press conferences).  Nasser and Conley presented evidence that ALDF concluded that publicity would further the representation and to accordingly issue a press release and make statements to the press and in tweets about the case.  *Cf. Russell v. Clark*, 620 S.W.2d 865, 868–70 (Tex. Civ. App.—Dallas 1981, writ ref'd n.r.e.) (discussing with approval *Sriberg v. Raymond*, 544 F.2d 15 (1st Cir. 1976), in which the privilege was extended to an attorney's allegedly defamatory pre-suit communications with a third party where the attorney "might well have believed" that the third-party would be induced to turn over funds the attorney claimed belonged to his client).  For the same reason, we similarly conclude that it was within the scope of Irvine & Conner's representation to post information and links to articles about the lawsuit on its website.  Indeed, Landry's concedes in its reply brief, "Attorneys have the right to publicize their cases," but Landry's errs in adding the caveat,

19

"but if they defame another in the process, they are held accountable just like anyone else."  As the Texas Supreme Court has explained, it is the *type* of conduct that matters, and this is not changed by describing that conduct that "wrongful."  *Cantey Hanger*, 467 S.W.3d at 485.

Landry's additionally contends that ALDF cannot claim attorney  immunity—that is, the judicial-proceedings privilege as it applies to counsel—because it is not a law firm. In support of this, Landry's cites Texas Government Code section 81.102(a) and Texas Business Organizations Code section 2.010.

The former statute states that, with certain exceptions, "a person may not practice law in this state unless the person is a member of the state bar."  TEX. GOV'T CODE ANN. § 81.102(a) (West 2013).  This statute is inapplicable, for only natural persons—such as Nasser—are members of the State Bar of Texas.  *See, e.g.*, *id.* § 81.115 (West Supp. 2017) (requiring the state bar to maintain a profile of each attorney licensed in the state, which must include the name of each law school attended and the date the attorney graduated). Attorney immunity nevertheless extends to the organizations through which attorneys render legal services.  For example, no attorney was a party to the appeal in *Cantey Hanger, LLP v. Byrd*, but the Texas Supreme Court nevertheless held that attorney immunity applied to Cantey Hanger's conduct within the scope of the representation of its client.  *Cantey Hanger*, 467 S.W.3d at 486.

Texas Business Organizations Code section 2.010 is similarly inapposite.  It states,

> A nonprofit corporation may not be organized or registered under this code to conduct its affairs in this state to . . . engage in a business or activity that may not be engaged in by a nonprofit corporation without first obtaining a license under the laws of this state and a license to engage in that business or activity cannot lawfully be granted to the corporation.

TEX. BUS. ORGS. CODE ANN. § 2.010(3) (West 2012).  Because law licenses are issued to individuals rather than to business entities, it cannot be said that the rendition of legal

20

services is an activity for which a non-profit corporation must first obtain a license. Non-profit organizations nevertheless can and do represent clients in Texas litigation.[11] ALDF is one such organization. *See, e.g.*, *Graham v. San Antonio Zoological Soc'y*, 261 F. Supp. 3d 711, 715 (W.D. Tex. 2017) (listing under the heading "Attorneys and Law Firms," "Carney Anne Nasser, Jeffrey Pierce, Animal Legal Defense Fund, Cotati CA, for Plaintiffs"); *Ctr. for Food Safety v. Lakey*, No. 03-13-00094-CV, 2014 WL 711622, at *1 (Tex. App.—Austin Feb. 19, 2014, no pet.) (mem. op.) (listing "Carter Dillard, Animal Legal Defense Fund" among the counsel for the appellant).

Regarding the defamation claims, we overrule Landry's second issue, which renders it unnecessary for us to address its first issue—that it met its initial burden to establish a prima facie case for each essential element for its claims—as to the defamation cause of action.

## V. THE REMAINING CAUSES OF ACTION

The existence of a valid defamation claim is the predicate for the Exhibitor's claims of business disparagement, tortious interference with prospective business relations, and civil conspiracy to commit defamation, business disparagement, and tortious interference with prospective business relations. To the extent that these claims are based on statements for which the Exhibitors met their burden of proof, we must determine whether the Exhibitors produced clear and specific evidence of each essential element of the cause

---

[11] The Legal Access Division of the State Bar of Texas publishes a referral directory that includes many such organizations. *See* 2017 Referral Directory: Legal Services and Other Resources for Low-Income Texans, *available at* https://www.texasbar.com/AM/Template.cfm?Section=Can_t_Afford_an_Attorney (last visited Oct. 16, 2018). For example, Lone Star Legal Aid identifies itself as a "nonprofit law firm" that "completed almost 25,000 legal cases" in 2016. *See* http://www.lonestarlegal.org/, (last visited Oct. 16, 2018). Texas RioGrande Legal Aid similarly describes itself as "a non-profit organization that provides free legal services to low-income residents in sixty-eight counties of Southwest Texas, and represents migrant and seasonal farm workers throughout the state of Texas." *See* http://www.trla.org/about/who-we-are (last visited Oct. 16, 2018).

of action. We also must determine whether the Exhibitors satisfied their initial burden to produce evidence of each essential element of their claims for abuse of process, trespass, civil conspiracy to commit theft, and their requests for declaratory and injunctive relief.

A. **Business Disparagement and Tortious Interference with Prospective Business Relations**

These two causes of action share a common element regarding damages. To prevail on a business-disparagement claim, a plaintiff must establish that (1) the defendant published false and disparaging information about the plaintiff, (2) the defendant acted with malice, (3) the defendant's publication of the information was not privileged, and (4) the publication resulted in special damages to the plaintiff. *Lipsky*, 460 S.W.3d at 592. "Special damages" are economic damages. *Id.* at 592 n.11. To prevail on a claim for tortious interference with prospective business relations, a plaintiff must prove that (1) there was a reasonable probability that the plaintiff would have entered into a business relationship with a third party, (2) the defendant either acted with a conscious desire to prevent the relationship from occurring or knew the interference was substantially certain to occur as a result of the conduct, (3) the defendant's conduct was independently tortious or unlawful, (4) the interference proximately caused the plaintiff injury, and (5) the plaintiff suffered "actual damage" or loss as a result. *Coinmach Corp. v. Aspenwood Apartment Corp.*, 417 S.W.3d 909, 923 (Tex. 2013).

Both causes of action require proof that the tortious conduct—here, defamation—resulted in actual or economic damages to the plaintiff. *See Brady v. Klentzman*, 515 S.W.3d 878, 886 (Tex. 2017) (explaining that actual or economic damages require proof of the existence and amount of those damages). Nominal damages are not "actual" damages. *See Kinney v. Barnes*, 443 S.W.3d 87, 100 (Tex. 2014).

To meet its burden to show that a defamatory statement published by one or more of the Conley Parties resulted in economic or other actual damages, Landry's points to

22

two lost bookings. At the beginning of August 2016, USA Legal Support sought to book an event at the Downtown Aquarium but allegedly told a sales manager around September 20, 2016, that "due to the recent tiger controversy, USDA Legal Support was concerned about the attention related to this and it no longer wanted to move forward with the event . . . ." Around October 27, 2016, the Danish Club of Houston inquired about booking an event to be held at the Downtown Aquarium a year later. On December 27, 2016, the Danish Club emailed Landry's that the members of the committee for the event decided to look at other venues and that the "deciding factor" in their decision "was the recent publicity about the poor treatment of the tigers at the Aquarium." Landry's nevertheless failed to produce clear and specific evidence establishing a prima facie case that the Conley Parties' conduct caused actual damages. *See Lipsky*, 460 S.W.3d at 593 (business-disparagement claim requires evidence of specific facts illustrating how the defendant's alleged business disparagement "actually caused such losses"); *Burbage v. Burbage*, 447 S.W.3d 249, 262 (Tex. 2014) (jury could not reasonably refer that cancelations of prepaid contracts with funeral home were caused by defendant's defamation).

First, the prospective customers' statements about the "recent publicity" or "recent controversy" are not specific to any of the Conley Parties. There is no evidence that members of USDA Legal Support or the Danish Club of Houston had even read an allegedly defamatory statement by one of the Conley Parties. *See Hurlbut v. Gulf Atl. Life Ins. Co.*, 749 S.W.2d 762, 767 (Tex. 1987) ("No evidence was offered of damages resulting from loss of business expected from any particular customer or prospective customer *to whom disparaging statements were made by defendants*." (emphasis added)). Statements by the Conley Parties were not the only source of "recent" publicity and controversy regarding the way in which Landry's treated the tigers. The Aquarium's general manager from 2011 to 2017 admitted, "There have been several protests at the

23

Downtown Aquarium in 2015 and 2016 by animal [sic] activists . . . ." The *Houston Chronicle* also noted that a petition drive was launched by animal-rights activists in 2015. The Big Cat Rescue, the Texas Human Legislation Network, and Animal Defenders International all picketed the restaurant in December 2015, and "Free Houston Tigers" organized another picketing event for July 29–30, 2016. Landry's evidence also shows that on November 18, 2016, "Free Houston Tigers" posted a call for a boycott on the Downtown Aquarium's Facebook page.

Second, even if it had been shown that a potential customer decided not to book the venue after reading one of the statements at issue in this case, Landry's still would have to show *which* statement the prospective customer read. Not all of the allegedly defamatory statements were false statements of fact published with actual malice, and not all statements are attributable to each of the Conley Parties.

Landry's cannot rely on speculation to satisfy its burden of proof. Because Landry's failed to establish a prima facie case as to each element of business disparagement and tortious interference with prospective business relations, we affirm the dismissal of these claims. Dismissal of these claims additionally is required for the independent reason that the judicial-proceedings privilege defeats the defamation claims, and thus, the business-disparagement and tortious-interference claims, which are predicated on the defamation claims, must fail as well. *See Rehak Creative Servs., Inc. v. Witt*, 404 S.W.3d 716, 733 (Tex. App.—Houston [14th Dist.] 2013, pet. denied) ("Because the underlying activity at issue in this case is not tortious given the absence of defamatory statements of fact about Rehak, the tag-along tort claims predicated on the same website content also fail."), *disapproved on other grounds by In re Lipsky*, 460 S.W.3d 579 (Tex. 2015) (orig. proceeding).

**B.    Abuse of Process**

To prevail in an abuse-of-process claim, a plaintiff must show that (1) "the defendant made an illegal, improper, or perverted use of the process, a use neither warranted nor authorized by the process"; (2) the defendant "had an ulterior motive or purpose" in engaging in such misuse of process; and (3) the misuse of process resulted in damage to the plaintiff. *Hunt v. Baldwin*, 68 S.W.3d 117, 129 (Tex. App.—Houston [14th Dist.] 2001, no pet.).   The claim is similar to a claim of malicious prosecution, the difference being that abuse of process is based on the improper use of process after it has been properly issued, whereas in a malicious-prosecution claim, it is the improper purpose that causes the process to be issued in the first place.  *See Bossin v. Towber*, 894 S.W.2d 25, 33 (Tex. App.—Houston [14th Dist.] 1994, writ denied).

Landry's alleged in its petition that the Conley Parties committed abuse of process by providing the Notice Letter to news media, issuing press releases about it, "sending it to and meeting with public officials in Houston," and "committing other inappropriate acts . . . with the improper intent to compel [Landry's] to give up possession of [the tigers] against [its] will."  Despite these statements, Landry's did not meet its burden as to this cause of action because its petition contains "no allegation that process of any kind was ever issued or executed."  *Blackstock v. Tatum*, 396 S.W.2d 463, 468 (Tex. Civ. App.—Houston 1965, no writ).   Landry's characterizes the Notice Letter as "process," a proposition for which Landry's quotes the Thirteenth Court of Appeals' statement, "Process has been broadly interpreted to encompass the entire range of procedures incident to litigation." *Martin v. Trevino*, 578 S.W.2d 763, 769 (Tex. Civ. App.—Corpus Christi 1978, writ ref'd n.r.e.).  "Process," however, is issued by a court. *See* TEX. R. CIV. P. 15 ("The style of all writs and process shall be 'The State of Texas" . . . .").  The "process" at issue in *Martin* was a citation, and all of the examples of process cited in that decision—summonses, mandates, writs of garnishment, and writs of sequestration—are

25

also documents issued by a court. We find no authority for treating a 60-day notice letter under the Endangered Species Act as "process" for the purpose of an abuse-of-process claim.

We overrule Landry's first issue as to this cause of action.

## C.    Trespass

Trespass consists of entry onto another's property without the owner's consent or authorization. *Envtl. Processing Sys., L.C. v. FPL Farming Ltd.*, 457 S.W.3d 414, 419 (Tex. 2015). Landry's alleged that Conley's free back-of-the-house tour of the Downtown Aquarium constituted a trespass because she obtained admission under false pretenses, and thus, Landry's consent to the tour was ineffective. Specifically, Landry's alleged that when Conley requested a back-of-the-house tour, she represented that she owned a radio station and had plans to use the information during a wildlife segment. Landry's asserts that "the real, but undisclosed, purpose of Conley's visit was to gather information and photographs that she could use, along with the other Defendants, in a campaign to defame Plaintiffs and coerce them into giving up their lawfully-held tigers."

In support of its argument that its consent to Conley's tour was ineffective, Landry's relies on Restatement (Second) of Torts § 892B(2) (1979):

> If the person consenting to the conduct of another is induced to consent by a substantial mistake concerning the nature of the invasion of his interests or the extent of the harm to be expected from it and the mistake is known to the other or is induced by the other's misrepresentation, the consent is not effective for the unexpected invasion or harm.

*See also State Farm Fire & Cas. Co. v. S.S.*, 858 S.W.2d 374, 378 (Tex. 1993) (plurality op.) (analyzing a battery claim under this section).

Landry's produced no evidence that the requirements of section 892B(2) have been met. It is undisputed that Conley does own a radio station as represented, and there is no evidence that Conley was not then considering a wildlife segment as she stated. Landry's

26

does not contend that Conley induced it to consent to the tour by representing that her coverage would be favorable, nor does Landry's allege that Conley knew Landry's consented based on such an assumption. Conley had consent to enter, to tour the property, and to take photographs, and she did not exceed the scope of the entry that was authorized. That Conley or others said negative things about Landry's eighteen months later based in part on what Conley saw and heard while on the property does not vitiate the consent that was given.

Because Landry's produced no evidence that Conley toured the Downtown Aquarium without its effective consent, we overrule Landry's first issue as to its trespass claim.[12]

**D. Civil Conspiracy to Commit Defamation, Business Disparagement, Tortious Interference with Prospective Business Relationships, Abuse of Process, and Trespass**

Strictly speaking, civil conspiracy is not an independent cause of action. *See Four Bros. Boat Works, Inc. v. Tesoro Petrol. Cos., Inc.*, 217 S.W.3d 653, 668 (Tex. App.—Houston [14th Dist.] 2006, pet. denied). It instead is a derivative tort in which the defendant's liability is predicated on liability for some underlying tort. *See id.* Conspiracy requires the "specific intent to agree to accomplish something unlawful or to accomplish something lawful by unlawful means." *First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 222 (Tex. 2017) (citing *ERI Consulting Eng'rs, Inc. v. Swinnea*, 318 S.W.3d 867, 881 (Tex. 2010)). To establish a conspiracy to commit the underlying tort, the plaintiff must prove that (1) two or more persons acted in combination; (2) the persons sought to accomplish an object or course of action; (3) the persons reached a meeting of the minds on that object or course of action; (4) at least one

---

[12] The trial court did not err in dismissing Landry's, Inc.'s trespass claim for the additional, independent reason that the company admitted in its pleadings that the physical facility is owned and operated by Houston Aquarium, Inc.

27

unlawful, overt act was taken in pursuit of that object or course of action; and (5) damages proximately resulted. *Id.*

To prevail on a conspiracy claim, a plaintiff must show that a defendant was liable for the underlying tort. *Four Bros. Boat Works*, 217 S.W.3d at 668 (citing *Hunt*, 68 S.W.3d at 133)). Because Landry's failed to meet its burden to establish each essential element of its claims of business disparagement, tortious interference with prospective business relationships, abuse of process, and trespass, its claims of conspiracy to commit those torts also fail. *See W. Fork Advisors, LLC v. SunGard Consulting Servs., LLC*, 437 S.W.3d 917, 920 (Tex. App.—Dallas 2014, pet. denied) ("[T]he viability of a conspiracy claim can be defeated by the claimant's failure to establish an underlying tort."). We overrule Landry's first issue as to these conspiracy claims.

## E.   Civil Conspiracy to Commit Theft

Landry's additionally alleged that the Conley Parties conspired to commit theft as defined in Texas Civil Practice and Remedies Code section 134.002(2) and Texas Penal Code section 31.03(a). *See* TEX. CIV. PRAC. & REM. CODE ANN. §134.002(2) (West Supp. 2017) (defining "theft" for the purpose of the Texas Theft Liability Act as "unlawfully appropriating property or unlawfully obtaining services as described in" Texas Penal Code section 31.03, among others); TEX. PENAL CODE ANN. § 31.03(a) (West Supp. 2017) ("A person commits an offense if he unlawfully appropriates property with intent to deprive the owner of property."). Specifically, Landry's alleged that the Conley Parties conspired to commit theft of the tigers by publishing the contents of the Notice Letter and by holding out their allegations as facts to the general public as a means of compelling Landry's to transfer title to the tigers.

But, Landry's did not allege that any of the Conley Parties in fact appropriated the tigers or that Landry's has transferred title to the tigers. If no one has appropriated the property at issue, then none of the Conley Parties can be liable for conspiracy to do so.

28

*See W. Fork Advisors*, 437 S.W.3d at 920; *Four Bros. Boat Works*, 217 S.W.3d at 668. Because the there is no allegation or evidence that the tigers have been unlawfully appropriated, we overrule Landry's first issue as to its claim of conspiracy to commit theft.

## F. Declaratory and Injunctive Relief

Finally, Landry's asked for a judicial declaration that the Conley Parties' statements were false, disparaging, and defamatory, and further asked that the trial court both require the Conley Parties to retract the statements and enjoin them "from further defaming or disparaging" Landry's. In effect, Landry's sought equitable relief both compelling and restraining the Conley Parties' future speech based on a declaration that some—but not all—of the elements of a defamation or business-disparagement claim have been satisfied. Landry's cites no authority that supports the availability of such relief.

Moreover, one of the requirements for declaratory relief is that "the declaration sought must actually resolve the controversy." *Brooks v. Northglen Ass'n*, 141 S.W.3d 158, 163–64 (Tex. 2004). And, as previously discussed, Landry's cannot prevail on its claims of defamation and business disparagement without first showing that the challenged statements (1) were false statements of fact, (2) were defamatory or disparaging, (3) were published with malice, and (4) damaged Landry's. A declaration addressing only the first two requirements would not resolve the controversy.

Regarding injunctive relief, we do not consider the request to enjoin the Conley Parties' future speech. Citing *Kinney v. Barnes*, 443 S.W.3d 87, 95 (Tex. 2014), Landry's stated in its response to the motions to dismiss, "To the extent *Kinney* forecloses injunctive relief to restrain *future* defamatory speech, Plaintiffs do not seek such relief."[13]

---

[13] Pls.' Resp. in Opp'n to Defs.' Mots. to Dismiss, at 115 n.19 (citation omitted).

For the reasons explained in *Kinney* and many other cases, a restraint on a defendant's future speech is not an available remedy for defamation. *See id*; *Hajek v. Bill Mowbray Motors, Inc.*, 647 S.W.2d 253, 255 (Tex. 1983) (per curiam); *Ex parte Tucker*, 220 S.W. 75, 76 (Tex. 1920). We therefore treat the request for such relief as abandoned.

As for Landry's request that the Conley Parties be ordered to issue a retraction, this, too, seeks an unavailable remedy. A comparison illustrates why this is so.

If a plaintiff prevails in a defamation claim based on statements the defendant posted on the internet, the court can order the defendant to delete the defamatory matter and ask third-party republishers to do the same. *See Kinney*, 443 S.W.3d at 93. This remedy is available because it constitutes "the erasure of past speech that has already been found to be unprotected in the context in which it was made." *Id.* In contrast, ordering a defendant to affirmatively issue a retraction would be to compel future speech. The same constitutional concerns that prevent a court from restraining future speech similarly prevents it from compelling future speech. *See Kinney*, 443 S.W.3d at 95 (explaining that the Texas Constitution's guarantee of a person's liberty of speech "cannot co-exist with a power to compel his silence or fashion the form of his speech" (quoting *Tucker*, 220 S.W. at 76); *cf. Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.*, 487 U.S. 781, 796–97, 108 S. Ct. 2667, 2677, 101 L. Ed. 2d 669 (1988) ("[T]he First Amendment guarantees 'freedom of speech,' a term necessarily comprising the decision of both what to say and what *not* to say.").

Because Landry's failed to make a prima facie showing of a right to the declaratory and injunctive relief it requested, we conclude that the trial court did not err in dismissing these requests.

## VI. Constitutionality

In the final rendition point regarding the dismissal of its claims, Landry's argues that the TCPA violates the jury-trial and open-courts provisions of the Texas Constitution.

We begin our analysis with the presumption that a statute is constitutional. *Nootsie, Ltd. v. Williamson Cty. Appraisal Dist.*, 925 S.W.2d 659, 662 (Tex. 1996). We construe statutes to avoid constitutional infirmities if possible *Id.* The party challenging a statute's constitutionality bears the burden on that issue. *See Edgewood Indep. Sch. Dist. v. Meno*, 917 S.W.2d 717, 725 (Tex. 1995).[14]

### A.    Right to a Jury Trial

Article I, section 15 of the Texas Constitution provides, "The right of trial by jury shall remain inviolate. The Legislature shall pass such laws as may be needed to regulate the same, and to maintain its purity and efficiency."[15]

The right to a jury trial is not self-executing; the Texas Rules of Civil Procedure require affirmative action to obtain a jury trial. *See Green v. W.E. Grace Mfg. Co.*, 422 S.W.2d 723, 725–26 (Tex. 1968). For the right to a jury trial to attach, a party must demand a jury trial and timely pay the required fee. TEX. CONST. art. V, § 10; TEX. R. CIV. P. 216. Here, Landry's demanded a jury trial, and because motions to dismiss under the TCPA are addressed on an accelerated schedule, the jury fee was not due by the time the motions were decided.

---

[14] A party may argue that a statute is unconstitutional on its face or as applied to that party. *See Tex. Workers' Comp. Comm'n v. Garcia*, 893 S.W.2d 504, 518 & n.16 (Tex. 1995). A statute is unconstitutional on its face only if every application of the statute violates the Constitution. *See Nootsie*, 925 S.W.2d at 663. Because Landry's does not expressly state whether it challenges the TCPA's constitutionality on its face or as applied, we determine this based on the arguments presented.

[15] This provision preserves the right to a jury trial only for those actions, or analogous actions, for which there was a right to a jury trial at the time the 1876 constitution was adopted. *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 450–52 (Tex. 1993).

Landry's argues that section 27.005(d) of the TCPA violates its right to a jury trial on its defamation-related claims because the statute requires a court to grant a motion to dismiss if the movant establishes a valid defense by a mere preponderance of the evidence. Landry's contends that there was conflicting evidence about whether ALDF and Nasser represented Conley, and thus, Landry's was entitled to have the jury resolve the factual dispute.

Although this is indeed a question of fact, it is an immaterial one because it cannot alter the disposition of the case. *See BP Am. Prod. Co. v. Red Deer Res., LLC*, 526 S.W.3d 389, 402 (Tex. 2017). As previously discussed, the judicial-proceedings privilege applies to ALDF whether it spoke as Conley's counsel or instead spoke as Conley's co-plaintiff in the planned suit under the Endangered Species Act. Similarly, the judicial-proceedings privilege applied to Nasser as an attorney whether her client was Conley or ALDF.

## B.    Challenge that the TCPA Violates the Open-Courts Provision

The open-courts provision of the Texas Constitution states, "All courts shall be open, and every person for an injury done him, in his lands, goods, person or reputation, shall have remedy by due course of law." TEX. CONST. art. V, § 13. This is a due-process guarantee that a person bringing a well-established common-law cause of action will not arbitrarily or unreasonably be denied access to the courts. *Yancy v. United Surgical Partners Int'l, Inc.*, 236 S.W.3d 778, 783 (Tex. 2007). Under this provision, "the legislature may not abrogate the right to assert a well-established common law cause of action unless the reason for its action outweighs the litigants' constitutional right of redress." *Tex. Workers' Comp. Comm'n v. Garcia*, 893 S.W.2d 504, 520 (Tex. 1995) (quoting *Trinity River Auth. v. URS Consultants, Inc.*, 889 S.W.2d 259, 261 (Tex. 1994)).

Landry's contends that the TCPA violates the open-courts provision for much the same reasons that the statute violates its right to a jury trial; we reject that argument for the reasons previously discussed.

Landry's additionally argues that the TCPA is unconstitutional because the trial court is required to decide a motion to dismiss on disputed fact issues without an evidentiary hearing; here, however, the only fact issues are immaterial, and the Texas Constitution does not guarantee the right to an evidentiary hearing on disputed immaterial facts.

Landry's further maintains that the TCPA is unconstitutional for the additional reason that the parties are denied normal discovery, but we agree with our sister courts that the discovery limitation does not violate the open-courts provision. *See, e.g.*, *Mem'l Hermann Health Sys. v. Khalil*, No. 01-16-00512-CV, 2017 WL 3389645, at *15–17 (Tex. App.—Houston [1st Dist.] Aug. 8, 2017, pet. denied) (mem. op. on reh'g); *Abraham v. Greer*, 509 S.W.3d 609, 615–16 (Tex. App.—Amarillo 2016, pet. denied). In particular, Landry's contends that it was denied the opportunity to cross-examine Nasser and Conley on the disputed facts regarding their claims of the judicial-proceedings privilege/attorney immunity. We disagree. The TCPA does allow limited discovery, which might have been permitted had it been properly requested. *See* section VII, *infra*.

Landry's next contends that the TCPA violates the open-courts provision by failing to state how the trial court is to determine the amount of sanctions that are appropriate to achieve deterrence. But the TCPA is not unique in this. For example, Chapter 10 of the Texas Civil Practice and Remedies Code authorizes trial courts to impose sanctions for the signing of frivolous pleadings and motions. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 10.001 (West 2017). A sanction under Chapter 10 "must be limited to what is sufficient to deter repetition of the conduct or comparable conduct by others similarly situated." *Id*. § 10.004(b). The statute does not state how this amount is to be determined, but the answer is found in case law. *See Nath v. Tex. Children's Hosp.*, 446 S.W.3d 355, 361–63 (Tex. 2014) (applying to Chapter 10 the two-part test established in *TransAmerican Natural Gas Corp. v. Powell*, 811 S.W.2d 913 (Tex. 1991) (orig. proceeding)). To

comply with the constitutional guarantee of due process, (1) there must be a direct relationship between the offensive conduct and the sanction imposed, and (2) the sanction must be just and not excessive. *See TransAmerican*, 811 S.W.2d at 917.

Finally, Landry's asserts that the TCPA violates the open-courts provision because the Act does not require the trial court to explain the basis for the sanctions award and because a plaintiff is required to pay the defendants' attorneys' fees and expenses if even one of the plaintiff's claims is dismissed under the TCPA. We conclude that these elements of the statute do not "act as an impermissible pay-to-play barrier" in violation of the open-courts provision because sanctions are imposed and litigation costs are shifted only after the claims are resolved. *See Khalil*, 2017 WL 3389645, at *16.

We overrule each of Landry's challenges to the TCPA's constitutionality.

## VII. DENIAL OF CONDITIONAL MOTION FOR DISCOVERY

According to Landry's, the trial court erred in denying its request for discovery. We review the denial of motion for discovery under the TCPA for abuse of discretion. *Walker v. Schion*, 420 S.W.3d 454, 458 (Tex. App.—Houston [14th Dist.] 2014, no pet.).

At the same time that Landry's filed its response to the Conley Parties' motions to dismiss, Landry's separately filed a "Motion, in the Alternative, to Conduct Limited Discovery." In the motion, Landry's stated that "if the Court determines that [Landry's] pleadings and supporting affidavits do not satisfy [its] evidentiary burden under the TCPA, the Court should allow [Landry's] to conduct discovery under Section 27.006(b) of the Texas Civil Practice and Remedies Code."

This request for discovery was contingent upon the trial court's concluding that Landry's had failed to establish a prima facie case for each essential element of its claims; the TCPA, however, states that the trial court "shall dismiss" the action if the plaintiff fails to meet its evidentiary burden. TEX. CIV. PRAC. & REM. CODE ANN. § 27.005. It

34

does not authorize the trial court to permit discovery *after* concluding that the plaintiff's evidence falls short. We therefore conclude that the trial court did not abuse its discretion in denying the conditional motion for discovery.[16]

Having now addressed each issue which could affect the dismissal of any of Landry's claims, we affirm that portion of the judgment.

## VIII. ATTORNEYS' FEES AND SANCTIONS

If a trial court dismisses a legal action under the TCPA, the statute requires the court to award the successful movant its reasonable attorneys' fees, other expenses as justice and equity may require, and sanctions "sufficient to deter the party who brought the legal action from bringing similar actions." *Id.* § 27.009.

### A. Attorneys' Fees

Regarding attorneys' fees, Landry's argues that if the dismissal of any claim is reversed, then attorneys' fees must be reassessed. Because we instead affirm the dismissal of each cause of action Landry's has asserted, this issue is moot.

Landry's additionally points out that, regarding attorneys' fees for Sprott Newsom's representation of ALDF and Nasser, the trial court conditionally awarded these parties $50,000 in the event Landry's were to unsuccessfully appeal to an intermediate appellate court; $25,000 in the event that Landry's were to file an unsuccessful petition for review; and a further $25,000 if Landry's were ultimately unsuccessful in an appeal to the Texas Supreme Court after the petition for review was granted. Landry's asks that we vacate this portion of the judgment because Sprott Newsome does not represent ALDF and Nasser on appeal, and ALDF and Nasser state that they do not oppose this request.

---

[16] Landry's also notes that the TCPA allows the trial court to extend the hearing date for the motion to dismiss if the trial court allows discovery. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 27.004(c). Here, however, Landry's set the motion for discovery to be heard at the same time as the motion to dismiss.

We accordingly sustain this part of Landry's fifth issue and modify the judgment to delete this award.

## B. Sanctions

Finally, Landry's asserts that the trial court's assessment of $450,000 in sanctions is excessive. We review sanctions awards for abuse of discretion. *See Am. Flood Research, Inc. v. Jones*, 192 S.W.3d 581, 583 (Tex.2006) (per curiam). A trial court abuses its discretion if the sanctions awarded are greater than necessary to promote compliance. *See Low v. Henry*, 221 S.W.3d 609, 614 (Tex. 2007).

We begin with the acknowledgment that the TCPA mandates an award of sanctions in addition to the award of attorneys' fees. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 27.009(a). Attorneys' fees therefore do not appear to be awarded as a sanction. This makes sense, given that the TCPA's purpose is to prevent the bringing of meritless lawsuits that discourage the exercise of certain constitutional rights. *See id.* § 27.002. Dismissal of such meritless claims is not itself sufficient to accomplish this because the party whose protected conduct is the subject of the claim is forced to bear the cost of vindicating those rights in court. An award of reasonable attorneys' fees and of just and equitable expenses is necessary not as a sanction, but simply to make that party whole. The award of fees and expenses therefore serves the same purpose as compensatory damages so that the party's future exercise of rights protected by the TCPA is not chilled.

Sanctions awarded for a successful motion to dismiss serve a different purpose. They are awarded "to deter the party who brought the legal action from bringing similar actions" in the future. *Id*. § 27.009(a)(2). Although the TCPA does not expressly list the guideposts by which this amount is to be determined, an appellate court nevertheless must review the award to determine whether the trial court assessed that amount arbitrarily or without reference to guiding principles such that the award is greater than necessary to serve that purpose.

36

In their motion to dismiss, ALDF and Nasser asked the trial court to impose a "large fine" and cited a TCPA case in which the trial court ordered the plaintiff to pay sanctions of $250,000.[17] Although sanctions are mandatory under the TCPA, Landry's did not address the request for sanctions in its 157-page response to the motion to dismiss or its 755 pages of exhibits. A week before the hearing, the Conley Parties filed a joint reply brief quantifying their sanction request and asking the trial court to impose sanctions of $500,000. They summarize their argument about Landry's conduct as follows:

> Nominally, "Houston's most famous billionaire" Tilman Feritta has hired the world's third-largest law firm to sue for less than $20,000. In reality, this suit aims to punish and deter lawyers and social activists who disagree with the way that Feritta's company treats endangered animals. Plaintiffs' purpose for filing this suit is especially evident from their submissions of a 157-page response accompanied by written objections to each and every defense exhibit (including exhibits that Plaintiffs then try to introduce themselves). Despite a decade of news coverage of their tigers and the fact that all of the comments here are about a high-profile public [sic], Plaintiffs refuse to concede that free speech or public concerns are at stake. And rather than contesting only those issues on which there could be a good-faith dispute, Plaintiffs have again done what SLAPPs exist to achieve: slam disliked speakers with more than 500 pages of paper filled with baseless assertions that nonetheless require time and money to beat back. As one example among many, Plaintiffs will not even concede the elementary principle that there can be no such thing as a declaratory judgment proclaiming a statement to be defamatory.

The trial court heard the motion to dismiss at an oral hearing on the record, which appears to have lasted over two hours.[18] Landry's did not reply to the Conley Parties' request for sanctions of $500,000 until two days after the hearing. Landry's then argued that

---

[17] *See* Order, *Schlumberger Ltd. v. Rutherford*, No. 2014-13621 (217th Dist. Ct. Aug. 27, 2014). The attempted interlocutory appeal of the portion of the order partially granting the motion to dismiss was dismissed for lack of jurisdiction. *See Schlumberger Ltd. v. Rutherford*, 472 S.W.3d 881, 884 (Tex. App.—Houston [1st Dist.] 2015, no pet.).

[18] The court reporter's record does not include any start or end time but generally, it has been our experience that a record of 60 pages is equal to about an hour, and this record was 178 pages.

sanctions were not justified under the factors listed in *Low v. Henry*, 221 S.W.3d 609, 620 n.5 (Tex. 2007).

Although *Low* addresses sanctions under Chapter 10 of Texas Civil Practice and Remedies Code, we agree that *Low* offers guidance in imposing sanctions under the TCPA. Because the purpose of sanctions under the TCPA is deterrence, the TCPA resembles Chapter 10 of the Texas Civil Practice and Remedies Code, which allows a person who signs a frivolous pleading or motion for an improper purpose to be sanctioned in an amount "limited to what is sufficient to deter repetition of the conduct or comparable conduct by others similarly situated." TEX. CIV. PRAC. & REM. CODE ANN. § 10.004(b) (West 2017). In assessing sanctions under Chapter 10, the trial court is to consider the following non-exclusive list of factors to the extent that they are relevant:

a. the good faith or bad faith of the offender;

b. the degree of willfulness, vindictiveness, negligence, or frivolousness involved in the offense;

c. the knowledge, experience, and expertise of the offender;

d. any prior history of sanctionable conduct on the part of the offender;

e. the reasonableness and necessity of the out-of-pocket expenses incurred by the offended person as a result of the misconduct;

f. the nature and extent of prejudice, apart from out-of-pocket expenses, suffered by the offended person as a result of the misconduct;

g. the relative culpability of client and counsel, and the impact on their privileged relationship of an inquiry into that area;

h. the risk of chilling the specific type of litigation involved;

i. the impact of the sanction on the offender, including the offender's ability to pay a monetary sanction;

j. the impact of the sanction on the offended party, including the offended person's need for compensation;

k. the relative magnitude of sanction necessary to achieve the goal or goals of the sanction;

l.    burdens on the court system attributable to the misconduct, including consumption of judicial time and incurrence of juror fees and other court costs;

. . .

n.    the degree to which the offended person's own behavior caused the expenses for which recovery is sought . . . .

*Low*, 221 S.W.3d at 620 n.5.

We have no evidence of element (a), good or bad faith,[19] but we do have some evidence as to element (b).  The trial court reasonably could have considered the fact that Landry's filed this suit fifty-nine days after the Conley Parties served their sixty-day Notice Letter as some evidence of willfulness and an indication that Landry's sued first to pre-empt the federal claims.  In fact, Landry's counsel argued in the trial court that it had to sue first rather than simply seeking dismissal of the Conley Parties' planned federal lawsuit because federal courts are reluctant to award attorneys' fees to successful defendants under the ESA.  We also have evidence of frivolousness in that some of Landry's claims lacked any legal or factual basis.  *Cf. Thompson v. Weaver*, 429 S.W.3d 897, 904 (Tex. App.—Tyler 2014, no pet.) (defining "frivolous" as used in Chapter 10 of the Texas Civil Practice and Remedies Code as "a thorough lack of factual or legal rigor in the party's position").  For example, Landry's preemptively asserted an abuse-of-process claim against the Conley Parties before any process had issued—a frivolous claim.  Landry's alleged that Conley trespassed on the facility even while acknowledging

---

[19] Determination of bad faith under Chapter 10 requires evidence of the party's subjective state of mind, which is lacking in this case.  *See WWW.URBAN.INC. v. Drummond*, 508 S.W.3d 657, 677 (Tex. App.—Houston [1st Dist.] 2016, no pet.); *see also Fuentes v. Zaragoza*, No. 01-16-00251-CV, 2018 WL 2437120, at *24 (Tex. App.—Houston [1st Dist.] May 31, 2018, no pet.) (mem. op.) ("Bad faith is the conscious doing of a wrong for dishonest, discriminatory, or malicious purposes; bad faith does not exist when a party merely exercises bad judgment or is negligent.").  Landry's asserted in its motion for new trial that it filed this lawsuit in good faith because it proved the falsity of some of the Conley Parties' statements.  But it failed to meet its burden as to many of the claims, and as Landry's acknowledges, dismissal under the TCPA is determined not by the action as a whole but on a claim-by-claim basis.

that Landry's consented to her visit—a frivolous claim. Landry's even alleged that the act of publishing the Notice Letter constituted conspiracy to commit theft as defined by the Texas Penal Code—a frivolous claim. As for Landry's requests for declaratory and injunctive relief, not only did Landry's ask for relief if it should prove only some of the elements of defamation, but Landry's also asked the trial court to both compel and restrain the Conley Parties' exercise of their right to freedom of speech—a request that Landry's itself acknowledged was foreclosed by binding precedent. Such claims are frivolous on their face, and predictably, Landry's failed to make a prima facie showing as to each essential element of these claims, as well as some others.

Landry's produced no evidence of actual damages. Although some of the challenged statements might be considered defamatory per se, Landry's presented no evidence that those statements resulted in actual damages to its business reputation. *See* section V.A., *supra.*

Regarding the effect of the sanctions on the offender, element (i), Landry's stated in its pleadings that it is "one of America's leading dining, entertainment, gaming and hospitality groups," which "owns and operates more than 500 properties, including more than 40 unique brands" as well as "numerous hotel properties and other entertainment destinations." From this, the trial court reasonably could infer that Landry's can afford to pay the sanctions imposed. And as for element (h) concerning the "risk of chilling the specific type of litigation involved," TCPA sanctions are expressly intended to deter the type of claims that Landry's brought: meritless claims based on another's exercise of protected constitutional rights.

Although these considerations properly could influence the trial court to assess higher sanctions than it might in a different situation, the sanctions cannot be arbitrary. The trial court's discretion in assessing sanctions must terminate at some figure, beyond which the sanctions become excessive. That terminus is a specific number, and in

determining whether the sanctions in this case exceed that number, we rely on two case-specific guideposts that are objectively quantifiable: we know the amount of the Conley Parties' reasonable attorneys' fees, costs, and expenses, and we know that the number of similar actions Landry's has filed is zero. As to the relevance of those facts, we find *Kinney v. BCG Attorney Search, Inc.*, No. 03-12-00579-CV, 2014 WL 1432012, at *11–12 (Tex. App.—Austin Apr. 11, 2014, pet. denied) (sub. mem. op.) to be instructive.

In *Kinney*, BCG's claims were dismissed under the TCPA, and BCG argued on appeal that the $75,000 sanctions imposed bore no relation to the actual litigation costs. *Id.* at *12.[20] As we do, the *Kinney* court analogized sanctions under the TCPA to sanctions under Chapter 10 of the Texas Civil Practice and Remedies Code and therefore considered the losing party's litigation history. *See id.* at *11–12. In affirming the $75,000 sanctions award, the court noted that BCG had filed previous actions for the same alleged harm and had been ordered to pay $45,000 in attorneys' fees in one of those actions. *Id.* at *12. The *Kinney* court therefore held that the trial court reasonably could have found that a sanction less than $75,000 was insufficient to deter BCG from filing a similar action.

In contrast, Landry's has never filed a similar action, and there is no evidence that sanctions in the amount of the Conley Parties' reasonable attorneys' fees would be insufficient to deter Landry's from filing a similar action in the future.

We do not hold that an award in that amount was required, for it was well within the trial court's discretion to award less than that amount. But we do not review the award de novo. Because we review the sanctions award only for abuse of discretion, it is not for this court to determine anew what an appropriate sanction would be. We hold only that, on this record, the trial court lacked discretion to award an amount that is larger than the only monetary guidepost in evidence.

---

[20] The amount of those fees is not stated in the opinion.

41

Because the trial court awarded ALDF sanctions in an amount 2.4 times greater than its attorneys' fees and awarded Conley sanctions of 2.8 times her attorneys' fees,[21] we conclude that these awards are arbitrary, and to the extent that the awards exceeded the amount of the Conley Parties' respective attorneys' fees, they are excessive. We accordingly suggest remittitur to reduce the sanctions to an amount equal to the attorneys' fees awarded to the Conley Parties for defending against the claims against them in the trial court. Specifically, we suggest remittitur of $146,814.74 from the $250,000.00 awarded to ALDF and $128,705.00 from the $200,000.00 awarded to Conley, bringing those awards respectively to $103,191.26 and $71,295.00. Thus, we sustain Landry's sixth issue in part.

## IX. CONCLUSION

As a matter of law, the judicial-proceedings privilege applies to the factual statements at issue, and thus, the statements do not support claims of defamation, business disparagement, tortious interference with prospective business relations, or conspiracy to commit any of these torts. As for Landry's remaining claims for abuse of process, trespass, and conspiracy to commit theft, and its requests for declaratory and injunctive relief, Landry's failed to satisfy its evidentiary burden to establish a prima facie case for each essential element of the claim or request. Because there are no material fact questions in this case, Landry's was not entitled to a jury trial or an evidentiary hearing, and thus, the TCPA is not unconstitutional on those grounds as applied to Landry's. The TCPA also is not rendered unconstitutional by its failure to specify how sanctions are to be measured, and it does not violate the open-courts provision as alleged. We further hold that the trial court did not abuse its discretion in denying Landry's conditional motion to conduct discovery.

---

[21] Nasser did not appeal the trial court's failure to award her sanctions.

We affirm the dismissal of Landry's claims, but modify the judgment to delete the conditional award of appellate attorneys' fees based on the representation of ALDF and Nasser by a law firm that in fact does not represent them on appeal. As modified, we affirm the judgment as to Nasser. As for ALDF and Conley, we conclude that, to the extent that the sanctions awarded to each of them exceeds the amount of that party's trial attorneys' fees, the sanctions are excessive. We therefore suggest remittitur to reduce the sanctions awarded to ALDF to $103,191.26 and to reduce the sanctions awarded to Conley to $71,295.00. Conditioned upon ALDF's and Conley's respective acceptance of remittitur, we further modify the judgment to reduce the sanctions awards as described, and as modified, affirm the judgment as to each of them.


/s/    Tracy Christopher
        Justice


Panel consists of Justices Christopher, Donovan, and Jewell (Jewell, J., concurring and dissenting).