

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-19-00037-CV

_____

PNC INVESTMENT COMPANY, LLC, Appellant

V.

FIAMMA STATLER, LP; FIAMMA MANAGEMENT GROUP, LLC, AND FRANK ZACCANELLI, JR., Appellees

---

On Appeal from the 342nd District Court
Tarrant County, Texas
Trial Court No. 342-294034-17

---

Before Sudderth, C.J.; Gabriel and Kerr, JJ.
Memorandum Opinion by Chief Justice Sudderth

## MEMORANDUM OPINION

## I. Introduction

Appellees Frank Zaccanelli Jr. and Fiamma Statler, LP, joined Mehrdad Moayedi and some of Moayedi's business entities in a property redevelopment project (the Project)[1] financed through a combination of public and private funds. Appellee Fiamma Management Group, LLC (FMG), a Zaccanelli entity, became the Project's omnibus property manager under a contract with the Master Tenant, 1914 Commerce Leasing, LLC. When the Master Tenant terminated FMG's contract, Appellees sued everyone involved in the Project, including Appellant PNC Investment Company, LLC (PNCIC), the Master Tenant's investor member.

The trial court denied PNCIC's Texas Citizens Participation Act (TCPA)[2] motion to dismiss Appellees' claims against it. In this accelerated interlocutory appeal, PNCIC argues that the trial court erred because Appellees' claims are subject to the TCPA and because Appellees failed to meet their burden to avoid dismissal.

---

[1]The Project involved the development of residential apartments, retail and office space, restaurants, and a hotel at 1914 Commerce Street in Dallas, Texas, in the historic Statler Hotel and Dallas Public Library buildings.

[2]The TCPA's recent amendments became effective September 1, 2019. *See* Act of May 17, 2019, 86th Leg., R.S., ch. 378, §§ 1–12 (codified at Tex. Civ. Prac. & Rem. Code Ann. §§ 27.001–.010). Because Appellees' lawsuit was filed before the amendments' effective date, it is governed by the prior version of the TCPA, and our citations refer to that version.

*See* Tex. Civ. Prac. & Rem. Code Ann. §§ 27.003, 27.008, 51.014(a)(12). We reverse and remand.

## II. Background

In addition to suing PNCIC, Appellees sued the Master Tenant, the Managing Member, Moayedi, and other companies related to the Project. Appellees grouped the defendants into three categories: the "Centurion Defendants,"[3] the "Fiduciary Defendants,"[4] and the Project's Financiers.[5] According to Appellees' live pleadings, the Project's funding "was to derive from public-private funds, including public

---

[3]Appellees identified the "Centurion Defendants" as Commerce Statler Development, LLC (the property owner); 1914 Commerce Investments, Inc.; Statler Developers, LLC; Centurion American Development Group, LLC; Centurion American Custom Homes, Inc. d/b/a Centurion American Development; Centurion Acquisitions, LP; TriArc Construction, LLC; 1914 Commerce GM, Inc.; Moayedi; the North Texas EB-5 Regional Center, LLC; and Statler 1900 Commerce, LLC. Appellees nonsuited Statler 1900 Commerce, LLC on January 22, 2019, just over a week before the hearing on that defendant's Rule 91a motion.

[4]Appellees identified the "Fiduciary Defendants" as Moayedi; 1914 Commerce GM, Inc.; Statler Developers, LLC; 1914 Commerce Investments, Inc.; and Centurion American ("as the de facto owner and controller of" 1914 Commerce GM, Inc., Statler Developers, LLC, and 1914 Commerce Investments, Inc.).

[5]Appellees identified the Project's Financiers as PNCIC; Jeffries, LLC; A&J Capital Investments, Inc. (the Project's EB-5 construction loan manager); Henry Global Consulting Group, LLC (a Chinese consulting firm involved in underwriting the Project's EB-5 loan); and Matthew D. Challis. Challis was a senior vice president with Jeffries' Municipal Securities Group in Dallas at the time of the bond sale; his home in Tarrant County anchored the case in the venue.

financing through federal and state historic tax credits,[6] selling those tax credits to private lenders, municipal tax increment financing,[7] and foreign investment through the federally regulated EB-5 program,[8] and some private equity." The Project was located in a 269-acre tax increment finance (TIF) district created to promote redevelopment in downtown Dallas.

---

[6] *See* 2 Arden H. Rathkopf et al., *Rathkopf's The Law of Zoning and Planning* § 19:50 (4th ed. 2020) (explaining that tax credits for historic building rehabilitation "allow for property owners and developers to be reimbursed for rehabilitation expenses by reducing tax liability on a dollar-for-dollar basis, as long as the projects satisfy statutory criteria"). Rehabilitation plans "must be reviewed and approved by the State Historic Preservation Officer and the National Park Service." *Id.*; *see* 26 U.S.C.A. § 47 (explaining federal "rehabilitation" tax credit program for historic buildings); Tex. Tax Code Ann. §§ 171.901–.909 ("Tax Credit for Certified Rehabilitation of Certain Historic Structures"). The National Park Service decides whether to approve the application for historic tax credits, but the Internal Revenue Service oversees the tax credits' use.

[7] *See* Tex. Tax Code Ann. §§ 311.001–.021 ("Tax Increment Financing Act"); *Jamro Ltd. v. City of San Antonio*, No. 04-16-00307-CV, 2017 WL 993473, at *1 (Tex. App.—San Antonio Mar. 15, 2017, no pet.) (mem. op.) (describing tax increment financing as a development tool used by municipalities to finance public improvements and infrastructure by leveraging private investment for certain types of development activities).

[8] EB-5 capital is a type of foreign investment visa program used in some domestic real estate ventures. *Lake v. Cravens*, 488 S.W.3d 867, 881 (Tex. App.—Fort Worth 2016, no pet.) (op. on reh'g); *see generally* 8 U.S.C.A. § 1153(b)(5). It is administered by U.S. Citizenship and Immigration Services (USCIS), and it permits foreign investors to obtain "green cards" by investing funds in a new commercial enterprise that, in turn, deploys the funds to a U.S. business that creates 10 jobs. *Great Sw. Reg'l Ctr., LLC v. ACSWD, LP*, No. 14-18-00679-CV, 2020 WL 205993, at *1 (Tex. App.—Houston [14th Dist.] Jan. 14, 2020, no pet.) (mem. op.). The process is administered by a regional center approved by USCIS. *Id.*

Appellees alleged that the Project's Financiers had "taken advantage of poorly-regulated federal investment programs" and coerced, cajoled, encouraged, helped, or assisted the Centurion Defendants "to steer the project into a web of fraud and misappropriation of public-private funds" after the Master Tenant terminated FMG's contract when FMG opposed hiring Tri-Arc by:

(1) compelling Moayedi, through the Centurion Defendants, to increase the federally-regulated loan amounts by $10 million at a double-digit interest rate;

(2) selling $41 million of a $46.5 million municipal TIF subsidy "for $26 million in cash to Jeffries through bonds issued by" Wisconsin's Public Finance Authority in 2016; and

(3) leasing office space in the Project to *The Dallas Morning News* at half of market value and giving away $15 million in finish-out construction for free, with the "the proceeds of the sale of fraudulently-procured historic tax credits" paid to TriArc, which Appellees described as the Centurion Defendants' "fledgling construction management firm," and its subcontractors TerraBridge and Tri-Tex, which Appellees described as "affiliated by common ownership and nepotism."

Appellees stated that they had notified PNCIC and the other Financiers about "ongoing irregularities in the construction, contracting, operation, financing, and budgeting" of the Project, "including unauthorized and unsupported budget increases, transfers of valuable project assets, wrongful termination of [FMG's] management role" on the Project, "and other violations of the Centurion Defendants' fiduciary duties to [Appellees] as minority owners," to no avail. Appellees claimed that they were stymied in their attempts to sell their minority interests in the Project to third parties because no one would give them the loan documents for potential purchasers

5

to review and that these documents "prove[d] not only an obligation to conduct due diligence and oversight, but also the right to control the decisions impacting use of EB-5 loan proceeds, TIF sale, federal historic tax credits, and the Old Dallas Public Library lease negotiation and execution."

Appellees sued the Fiduciary Defendants for breach of fiduciary duty and sued the Centurion Defendants for fraud, breach of contract, tortious interference, theft, and conversion. They sued PNCIC for fraud, tortious interference with contract, conspiracy; for aiding and abetting the fraud of the other Financiers; for aiding and abetting the Fiduciary Defendants' breach of fiduciary duty; and for aiding and abetting the Centurion Defendants' fraud, theft, and conversion.

PNCIC moved to dismiss Appellees' claims under the TCPA based on its exercise of the rights of free speech and association. PNCIC complained that the lawsuit's underpinning was "a tussle" between Moayedi and Zaccanelli, that PNCIC had not been aware of the termination of FMG's contract "until after the fact and had nothing to do with it," that PNCIC had no duty to police Appellees' relationship with Moayedi, and that Appellees had sued PNCIC to pressure it into buying out Zaccanelli. In support of its motion, PNCIC attached a copy of a January 20, 2017 letter to PNCIC from Appellees' counsel[9] and the unsworn declaration of Holly Jacoby, a PNCIC vice president during the relevant time period.[10]

---

[9]In the January 20, 2017 letter, Appellees' counsel told PNCIC that "[t]he only pathway to resolution of any dispute . . . is for PNC[IC] to create a pathway for Mr.

6

To its response to PNCIC's motion to dismiss,[11] Appellees attached Zaccanelli's unsworn declaration and two of Jacoby's depositions, one of which had been taken pursuant to court-authorized TCPA discovery. At the hearing on PNCIC's motion, both parties urged the trial judge to read Jacoby's depositions. However, the trial court's order denying PNCIC's motion does not reflect that this evidence was considered; rather, it states only that the trial court considered "the Motion, the response of [Appellees], PNCIC's Reply, the pleadings, and the arguments of counsel."

---

Zaccanelli and Fiamma to find a way out of its relationship with Mr. Moayedi" and warned, "If PNC[IC] wishes to avoid further dealings with Mr. Zaccanelli and Fiamma, then Fiamma encourages PNC[IC] . . . to offer solutions that allow[] a third party to purchase Fiamma's and Mr. Zaccanelli's interest which is Fiamma's constitutional right that now is being blocked by PNC[IC]'s inaction."

[10]*See* Tex. Civ. Prac. & Rem. Code Ann. § 132.001(a) (stating that, with some exceptions not applicable here, an unsworn declaration may be used in lieu of a written sworn declaration, verification, certification, oath, or affidavit required by statute or required by a rule, order, or requirement adopted as provided by law).

[11]Appellees complained in their TCPA response and complain in their appellate brief that PNCIC did not move for dismissal on their aiding-and-abetting claims involving theft and conversion. However, in its reply brief in the trial court, PNCIC stated that it had attacked the entire basis for the aiding-and-abetting claim as applicable to all of the theories that Appellees put forth to support it, and we note that the same aiding-and-abetting elements would apply for each of the underlying torts. *See, e.g., G & H Towing Co. v. Magee*, 347 S.W.3d 293, 297 (Tex. 2011) (referencing harmless-error exception in summary judgment practice when omitted cause of action is precluded as a matter of law by other grounds raised in the case).

## III. Discussion

We review de novo a trial court's ruling on a TCPA motion. *Beving v. Beadles*, 563 S.W.3d 399, 404 (Tex. App.—Fort Worth 2018, pet. denied).

The first step in the TCPA's burden-shifting analysis is for the defendant-movant to show by a preponderance of the evidence that the plaintiff's claim is based on, relates to, or is in response to the movant's exercise of the right of free speech, the right to petition, or the right of association. *See* Tex. Civ. Prac. & Rem. Code Ann. § 27.005(b); *Ghrist v. MBH Real Estate LLC*, No. 02-17-00411-CV, 2018 WL 3060331, at *1 (Tex. App.—Fort Worth June 21, 2018, no pet.) (mem. op.). If the movant satisfies its burden, then the nonmovant has to establish "by clear and specific evidence a prima facie case for each essential element of the claim in question." Tex. Civ. Prac. & Rem. Code Ann. § 27.005(c); *Ghrist*, 2018 WL 3060331, at *1.

In its first issue, PNCIC argues that Appellees' claims against it for fraud, tortious interference with contract, conspiracy, and aiding and abetting involve PNCIC's rights of speech or of association.[12]

## A. TCPA Right of Free Speech

Under the TCPA, the "exercise of the right of free speech" is defined as "a communication made in connection with a matter of public concern." Tex. Civ. Prac.

---

[12]Because we resolve this issue on the free-speech ground, we do not reach the free-association ground. *See* Tex. R. App. P. 47.1.

& Rem. Code Ann. § 27.001(3). "Communication" is defined to include "the making or submitting of a statement or document in any form or medium, including oral, visual, written, audiovisual, or electronic." *Id.* § 27.001(1). A "matter of public concern" includes, among other things, an issue related to economic or community well-being or to the government. *Id.* § 27.001(7)(B), (C).

A communication made in connection with a matter of public concern must have public relevance beyond the pecuniary interests of the private parties involved: "A private contract dispute affecting only the fortunes of the private parties involved is simply not a 'matter of public concern' under any tenable understanding of those words." *Creative Oil & Gas, LLC v. Lona Hills Ranch, LLC*, 591 S.W.3d 127, 136–37 (Tex. 2019). But because we may not narrow the TCPA's scope by ignoring its plain language, if an alleged communication has even a tangential relationship to a matter of public concern, then it meets the TCPA's requirements, and as long as the communication involves a public subject, it need not be made in a public form. *ExxonMobil Pipeline Co. v. Coleman*, 512 S.W.3d 895, 900 (Tex. 2017) (per curiam); *see Creative Oil & Gas, LLC*, 591 S.W.3d at 135.

In contrast to communications made in connection with matters of public concern, commercial speech is exempted from the TCPA. Tex. Civ. Prac. & Rem. Code Ann. § 27.010; *Castleman v. Internet Money Ltd.*, 546 S.W.3d 684, 688 (Tex. 2018) (per curiam); *VetMoves v. Lone Star Veterinarian Mobile Surgical Specialists, PC*, No. 02-19-00340-CV, 2020 WL 1887770, at *3 (Tex. App.—Fort Worth Apr. 16, 2020, no pet.)

9

(mem. op.). Our supreme court has explained that the TCPA commercial speech exemption applies when

> (1) the defendant was primarily engaged in the business of selling or leasing goods [or services], (2) the defendant made the statement or engaged in the conduct on which the claim is based in the defendant's capacity as a seller or lessor of those goods or services, (3) the statement or conduct at issue arose out of a commercial transaction involving the kind of goods or services the defendant provides, and (4) the intended audience of the statement or conduct were actual or potential customers of the defendant for the kind of goods or services the defendant provides.

*Castleman*, 546 S.W.3d at 688. The exemption is wholly unnecessary unless the TCPA applies. *Id.*

In determining whether the TCPA applies, we first look to the plaintiff's allegations; when it is clear from the plaintiff's pleadings that the action is covered by the TCPA, the defendant need show no more. *Hersh v. Tatum*, 526 S.W.3d 462, 467 (Tex. 2017) ("The basis of a legal action is not determined by the defendant's admissions or denials but by the plaintiff's allegations.").

## B. Appellees' Live Pleadings

Appellees alleged that their suit was based on the misuse of public funds—federal and state historic tax credits, municipal tax increment financing, and foreign investment through the federally regulated EB-5 program—"by a private developer at the behest and assistance of its lenders[,] . . . victimiz[ing] yet another redevelopment project funded by public money," and that this "is a case of corporate greed and self-dealing on a high-profile, publicly-funded construction project in downtown Dallas."

10

Appellees claimed that PNCIC had not been merely a passive investor but rather had "assumed an oversight role" on the Project, had "insisted upon and imposed an Operating Agreement[13] to govern and control the operations of the [P]roject that required PNCIC's approval before financial and operations decisions occurred," and had then "encouraged or allowed" the hiring of TriArc, TerraBridge, and Tri-Tex—Moayedi-related companies—after FMG's contract was wrongfully terminated. Appellees asserted that PNCIC, in the course and scope of its role as an investor member making decisions regarding financing, budget, capital, and operations, had traveled to Dallas to meet with "Moayedi, Centurion, 1914 Commerce GM, and others" and had "participated in numerous periodic meetings and conference calls regarding the Project."

Appellees alleged that PNCIC had pressured the Centurion Defendants to add more partner equity to the Project's capital stack to protect its investment after the budget increase was sought, which had led to a "fraudulent capital call" and then to the sale of the TIF and to PNCIC's obtaining additional Federal Historic Tax Credits. And they alleged that all leases had required PNCIC's approval and that PNCIC had insisted—after FMG's wrongful termination—that the Centurion Defendants enter into a below-market, commercially unreasonable, and unprofitable commercial real

_____

[13]The agreement between PNCIC and the Master Tenant is the Amended and Restated Master Tenant Operating Agreement (MTOA), which Appellees attached to their live pleadings.

11

estate lease with *The Dallas Morning News*. Appellees also alleged that PNCIC had owed them a duty to provide "the information, documents, books and records" necessary to sell their interest in the Project to third parties.

As to Appellees' claims against PNCIC for fraud, fraudulent inducement, and fraud by nondisclosure, they alleged that PNCIC was liable to Fiamma Statler and Zaccanelli because of "written representations of material fact in the [MTOA]" that PNCIC then failed to perform, refused to perform, or never intended to perform. They contended that the representations induced them to invest in the Project and that PNCIC thus owed them a duty to oversee the Project's expenditures and leases. And they asserted that PNCIC had refrained from providing information to them and that the failures to disclose had devalued their interests in the Project.

Appellees claimed that PNCIC had committed tortious interference with contract because it had assisted in, participated in, encouraged, or promoted the wrongful termination of FMG's contract; that PNCIC had committed conspiracy "to enact and further the fraudulent scheme to misuse EB-5 loan proceeds by over-inflation of the [P]roject budget" and other acts involving the TIF funds and *The Dallas Morning News* lease; and that because PNCIC had conspired, "the acts, words, and deeds of each conspirator are the acts, words, and deeds of every Defendant." They also claimed that PNCIC was liable for aiding and abetting the fraud of others, as well as others' breaches of fiduciary duty, theft, and conversion, claiming that

12

PNCIC had "coerced, cajoled, encouraged, assisted, and/or helped" in accomplishing these torts.

## C. Analysis

Based on the allegations in Appellees' live pleading, we hold that the TCPA applies because PNCIC's communications as alleged by Appellees[14] involve a matter of public concern beyond the pecuniary interests of private parties because the lawsuit involves communications about a redevelopment project located in a TIF district and partially funded by public money in the form of federal and state historic tax credits, municipal tax increment financing, and foreign investment through the federal EB-5 visa program. *See Creative Oil*, 591 S.W.3d at 136–37; *ExxonMobil Pipeline Co.*, 512 S.W.3d at 900. That is, at every level, the Project was undergirded by the public fisc—and where the public's purse goes, so goes the public's concern. This Project, for TCPA purposes, was more than a purely private commercial transaction in which the public had no stake. *Cf. Farhat v. Wilson Scott, LLC*, No. 02-19-00438-CV, 2020 WL 1949624, at *6 (Tex. App.—Fort Worth Apr. 23, 2020, no pet.) (mem. op.) (affirming denial of TCPA motion when alleged communications were related to *purely private* business transactions); *Anders v. Oates*, No. 02-19-00116-CV, 2020 WL 1809654, at *7

---

[14]Appellees argued at the hearing and on appeal that their pleadings alleged actions rather than "communications," and they refer us to *Smith v. Crestview NuV, LLC*, 565 S.W.3d 793, 798 (Tex. App.—Fort Worth 2018, pet. denied), in which we held that the TPCA did not apply because the plaintiff did not allege a "communication." However, unlike the plaintiff in *Smith*, Appellees based their claims against PNCIC in part on its "written representations" in the MTOA.

13

(Tex. App.—Fort Worth Apr. 9, 2020, no pet.) (mem. op.) (affirming denial of TCPA motion when alleged communications were unrelated to matters of political, social, or other community concerns); *Garrison Inv. Grp. LP v. Lloyd Jones Capital, LLC*, No. 02-19-00115-CV, 2019 WL 5996979, at *5 (Tex. App.—Fort Worth Nov. 14, 2019, no pet.) (mem. op.) (affirming denial of TCPA motion when communications underlying claims were not founded on character of facility's HUD-insured mortgage).

We sustain this portion of PNCIC's first issue and do not reach whether the commercial speech exemption applies or whether Appellees met their burden to show by clear and specific evidence a prima facie case of each essential element of every claim they asserted against PNCIC because the trial court's order denying PNCIC's motion and the record reflect that the trial court considered only the motion, the response, the pleadings, and the arguments but not any of the parties' evidence on these matters. *See Hersh*, 526 S.W.3d at 467 (construing "shall consider the pleadings" and "by a preponderance of the evidence" to hold that when it is clear from the plaintiff's pleadings that an action is covered by the TCPA, a *defendant* need show no more); *cf. Adams v. Starside Custom Builders, LLC*, 547 S.W.3d 890, 897 (Tex. 2018) (noting that the court's focus was on the pleadings for the first step of the TCPA analysis before remanding case to the intermediate court to reach the second step of the TCPA analysis). Accordingly, we remand this case for the trial court to consider the parties' TCPA evidence.

14

Before we reverse the trial court's order, however, we will consider Appellees' constitutional arguments.

Appellees argued in the trial court and argue on appeal that the "expansive application of the TCPA violates [their] constitutional rights to trial by jury, access to open courts, due process, due course of law, protection against vague statutes and standards, and protection against unconstitutionally high standards." PNCIC replies that under established law, the TCPA is not unconstitutional and that "Appellees' six separate attempts to evade the TCPA by claiming it is unconstitutional merely illustrate the complete lack of any facts to support their claims in this case."

Most of Appellees' complaints are grounded in due process and pertain to the TCPA's discovery limitations, its "clear and specific" evidence requirement, and its expedited time frame. *See Tenet Hosp. Ltd. v. Rivera*, 445 S.W.3d 698, 703 (Tex. 2014) ("In short, an open courts challenge is a due process complaint."). But they also complain that the statutory language is unconstitutionally vague because it "fails to give ordinary parties fair notice of the conduct prohibited[] and is so indefinite that it encourages arbitrary and discriminatory enforcement by the trial courts."

To prevail on their "open courts" due process arguments, Appellees had to raise a fact issue establishing that they did not have a reasonable opportunity to be heard, *see Stockton v. Offenbach*, 336 S.W.3d 610, 618 (Tex. 2011); had to show that they had a cognizable common law cause of action that was being statutorily restricted; and had to show that the restriction was arbitrary and unreasonable when balanced against

15

the statute's legislative purpose and basis.  *See Alpine Indus., Inc. v. Whitlock*, 554 S.W.3d 174, 181 (Tex. App.—Fort Worth 2018), *aff'd in part, rev'd in part sub nom. Shinogle v. Whitlock*, 596 S.W.3d 772 (Tex. 2020).

In *In re Lipsky*, the court stated that the TCPA's purpose is to identify and summarily dispose of lawsuits designed only to chill First Amendment rights, not to dismiss meritorious lawsuits, and to accomplish its purpose, it "endorses a summary process, requiring judicial review of the pleadings and limited evidence."  460 S.W.3d 579, 589–90 (Tex. 2015) (orig. proceeding).  Summary processes are not per se unconstitutional.  *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351 (requiring plaintiff in healthcare liability suit to file expert report or face dismissal), § 128.053 (requiring plaintiff in lawsuit against a sport shooting range to file expert report or face dismissal), § 150.002 (requiring plaintiff in professional negligence suit to file certificate of merit or face dismissal); *Alpine Indus., Inc.*, 554 S.W.3d at 185 ("[T]he chapter 128 expert report requirement, by itself, does not deprive the Whitlocks of a jury trial or infringe on their right to equal protection or due process under the law."); *Rosenthal v. Boyd*, No. 03-11-00037-CV, 2013 WL 1876513, at *4 (Tex. App.—Austin May 1, 2013, no pet.) (mem. op.) (noting that dismissal of healthcare liability claim or professional negligence claim for failure to file report "means that the plaintiff has failed to raise fact issues for a jury to decide, which in turn means the plaintiff has no right to a jury trial"); *see also* Tex. R. Civ. P. 166a; *Lattrell v. Chrysler Corp.*, 79 S.W.3d 141, 150 (Tex. App.—Texarkana 2002, pet. denied) ("When a party cannot show a

material fact issue, there is nothing to submit to a jury, and the grant of summary judgment to the opposing party does not violate the constitutional right to a jury trial."). *See generally Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 336, 99 S. Ct. 645, 654 (1979) (observing that directed verdict is not unconstitutional under the Seventh Amendment).

While all discovery in a legal action is generally suspended upon the filing of a TCPA motion to dismiss, the TCPA allows limited discovery, if properly requested and upon a showing of good cause. *See* Tex. Civ. Prac. & Rem. Code Ann. §§ 27.003(c), .006(b). That is, the provisions staying discovery are tempered by provisions permitting discovery upon a showing of good cause and operate to "curtail potentially costly discovery in a possibly meritless case, thus serving the TCPA's goal of keeping litigation from being used to chill the exercise of constitutional rights." *Combined Law Enf't Ass'n of Tex. v. Sheffield*, No. 03-13-00105-CV, 2014 WL 411672, at *10 (Tex. App.—Austin Jan. 31, 2014, pet. denied) (mem. op.); *see Landry's, Inc. v. Animal Legal Def. Fund*, 566 S.W.3d 41, 68 (Tex. App.—Houston [14th Dist.] 2018, pet. denied) ("[T]he [TCPA] discovery limitation does not violate the open-courts provision.").

Here, Appellees made no showing in the trial court that the TCPA discovery restrictions are arbitrary and unreasonable as applied to them. To the contrary, the record reflects that the trial court granted their motion for discovery in response to PNCIC's TCPA motion, allowing Appellees to take a second deposition of Jacoby

17

and requiring PNCIC to produce the following documents in connection with her deposition: (a) a copy of any amendments or supplements to the MTOA that had not been previously produced and (b) communications in 2016 between PNCIC and the Moayedi/Centurion Defendants, on which no representative or constituent of Appellees was a recipient, regarding: (i) budget increases, and the reasons for such budget increases, regarding the construction of the interior finish out of the Statler Hotel Project in 2016; (ii) 1914 Commerce GM Inc.'s request to PNCIC and application for additional federal historic tax credits regarding interior finish out of the Statler Hotel Project in 2016; and (iii) whether the sale of the TIF in August 2016 should occur.

The supreme court has addressed the argument that the TCPA imposes a higher standard of proof than that required at trial by noting that although the TCPA initially demands more information about an underlying claim than mere notice-pleading, it "does not impose an elevated evidentiary standard or categorically reject circumstantial evidence. In short, it does not impose a higher burden of proof than that required of the plaintiff at trial." *Lipsky*, 460 S.W.3d at 591; *see also Sheffield*, 2014 WL 411672, at *10 (pointing out that a prima facie case "represents the minimum quantity of evidence necessary to support a rational inference that the allegation of fact is true" and that the TCPA's "clear and specific" prima facie standard thus does not increase the burden of proof or cause it to exceed a preponderance of the evidence).

And although Appellees claim that the TCPA's language is unconstitutionally vague for failing to give fair notice of prohibited conduct, by its plain language, the TCPA does not *prohibit* any conduct. *See generally* Tex. Civ. Prac. & Rem. Code Ann. § 27.003(a) (providing for statutory protection of a party's exercise of the right of free speech, right to petition, or right of association); *Sheffield*, 2014 WL 411672, at *12. Thus, we conclude that Appellees' constitutional arguments did not require the trial court to deny PNCIC's motion to dismiss.

## IV. Conclusion

Having sustained part of PNCIC's first issue, we reverse the trial court's order and remand the case to the trial court to consider the applicability of the TCPA's commercial speech exemption and, if the commercial speech exemption does not apply, whether Appellees produced "clear and specific evidence" to support a prima facie case for each claim asserted against PNCIC.

/s/ Bonnie Sudderth
Bonnie Sudderth
Chief Justice

Delivered: September 3, 2020

19